UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
UNITED STATES OF AMERICA      :
                              :
   -against-                  :        NOTICE OF MOTION
                              :
TAMBHIA TUCKER,               :
                              :        18-119 (SJ)
                              :        Oral Argument Requested
         Defendant.           :
--------------------------------------------------------X

PLEASE TAKE NOTICE, that the defendant **Tambhia Tucker**, by his

attorney **Allegra Glashausser**, of the Federal Defenders of New York, and upon the

accompanying declaration and memorandum of law will move the Court, before the

Honorable Sterling Johnson, Jr., United States District Judge for the Eastern District

of New York, for an Order:

1. Excluding the government from admitting at trial the testimony of Matthew Parlo or any other ballistics analyst and other evidence relating to the toolmarks matching process;

2. Alternatively, (a) limiting the testimony of the ballistics analyst to testify only to a reasonable degree of certainty in the field of ballistics, or that a match is more likely than not; (b) precluding the analyst from testifying that he is certain or 100% sure that two items match, that a match is to the exclusion of all other firearms, or that there is a practical impossibility that any other gun could have fired the recovered materials; (c) requiring the analyst to qualify his opinion by acknowledging, or requiring the government to stipulate, that there has only been one appropriately designed black-box study on ballistics identification, that this study has not been published in a scientific journal and that this study found a false positive rate of 1 in 66, with a confidence bound indicating that the rate could be as high as 1 in 46; and (d) requiring that the government acknowledge (through testimony or stipulation) that the foundational validity of firearms analysis as a field has not been established;

1

3. In the alternative, directing that a hearing be held outside the presence of the jury before trial as to the admissibility of the ballistics analyst's testimony;

4. Additionally, ordering the government to provide additional discovery relating to the ballistics analysis, including error rates, inconsistencies across examiners, detailed information about proficiency testing and whether examiners were aware of any other facts of this case during their analysis, and greater specifics of the analyst's conclusions in this case;

5. Granting such other and further relief as the Court may deem just and proper.

DATED:   BROOKLYN, N.Y.
January 14, 2019

_____/s/
Allegra Glashausser
Attorney for Mr. Tambhia Tucker
Federal Defenders of New York, Inc.
1 Pierrepont Plaza, 16th Floor
Brooklyn, N.Y. 11201
(212) 417-8739

Cc:   AUSA Turner Buford
Mr. Tambhia Tucker

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
UNITED STATES OF AMERICA          :
                                                          :
    -against-                                    :
                                                          :
TAMBHIA TUCKER,                         :
                                                          :          18-119 (SJ)
                                                          :          Oral Argument Requested
           Defendant.              :
--------------------------------------------------------X

ALLEGRA GLASHAUSSER submits this factual declaration in support of Mr.

Tucker's motion to exclude the testimony of the government ballistics and DNA

analysts:

1.     I am an attorney with the Federal Defenders of New York, Inc., counsel to

Defendant Tambhia Tucker. I respectfully submit this declaration in support of Mr.

Tucker's motion to exclude ballistics evidence.

2.     According to the government's expert disclosure, dated November 26, 2018, it

intends to call Matthew Parlo, a detective with the New York City Police Department,

as an expert. The government's expert disclosure letter states that Parlo will testify

"regarding, among other things, his examination and comparison of ballistics

evidence, including his observations and conclusions with respect to ammunition and

shell casings recovered from the scene." It refers counsel to the discovery marked

TUCKER734-35; 737; 758-779; 788-805; 811-823. The letter does not explain any

more specifically what Parlo will testify about or indicate what his conclusions are.

1

The government has not provided any other "written summary" of the testimony it expects from Parlo. *See* Rule 16 (G) (requiring that the government provide the defense a "written summary of any [expert] testimony" it intends to use at trial).

3.     Parlo's "statement of qualifications" indicates that, since 2008, he has done casework on firearms operability, firearms microscopy, serial number restoration, and firearms NIBIN/IBIS (National Integrated Ballistic Information Network Integrated Ballistic Identification System) entry and correlation. TUCKER827-829. He has an A.A.S., associates degree, from SUNY Farmingdale University, in Computer Information Systems. He completed a NIBIN/IBIS training in 2015 through the NYPD Police Laboratory, a microscopy training in 2011 through the NYPD Police Laboratory, and a 3D microscopy course in 2010 through Leica, a microscope company. *Id.*

4.     Through discovery, the government has provided the defense "Microscopic Analysis Reports" for bullet casings, cartridges, and fragments, labeled with a "Laboratory Item number" between numbers between 1 and 43. The reports present numerous assertions about these bullets and cartridges matching each other, not matching each other, or being inconclusive matches to each other. None of the reports include conclusions about how many guns produced the bullets and cartridges.

2

5.    Parlo compares some of these bullets and cartridges to a gun that was found on a person arrested on September 6, 2017. That person was not charged with any crime related to this case.

6.    A first set of reports, dated Aug. 16, 2017, indicates that Parlo decided cartridge casings 1 and 3-8, were discharged from the same gun, based on what he observed as an agreement of "class characteristics and sufficient agreement of individual characteristics." TUCKER 758-767, 768-779. Cartridge 2, as compared to 1, 3-8, "revealed the presence of cycling marks, but the marks were determined to lack sufficient class and individual characteristics for identification." *Id.*

7.    In the same reports, fragments 9-11 and 12-15 are marked as "inconclusive" as to whether they were discharged from the same gun; however, the examiner also determined that the same groups of fragments, 9-11 and 12-15, were not fired from the same gun. Tucker 764. Why the examiner grouped 9-11 and 12-15 together was not explained. Nothing is written in the "remarks" section. TUCKER000759.

8.    This file also include four "Microscopy worksheets," with notes of the observed characteristics. Only one firearms photo worksheet, containing one black and white split photo, is included for the report for items 1-15. TUCKER000766.

9.    These reports indicate that "Valenti" did a verification on Aug. 16, 2017. The government has not yet provided any information about "Valenti."

3

10.     A second batch of reports, dated Aug. 24, 2017, is for items 9-15, and 32-42. TUCKER788-805. Although this second report seemingly involved a retesting of items numbers 9-12, the first report does not appear to be referenced.

11.     This batch states that Parlo believed that deformed bullets 12, 36, and 43 were discharged from the same gun. He believed that other bullet fragments 14, 32, 35, and 39 were discharged from a second gun. Bullet fragments 10, 11, 41, and 42 were inconclusive to each other and to items 12, 36, 43, based on agreement of class characteristics but insufficient agreement or disagreement of individual characteristics. This second round of reports includes one blurry firearms photo worksheet. TUCKER000804.

12.     A third round of reports, dated Aug. 31, 2017, were completed by a different analyst, Detective Robert Liguori. TUCKER 806-810. Liguori's report states that cartridge casings 16-25 were fired from the same gun based on the agreement of their class characteristics and sufficient agreement of their individual characteristics. One firearms photo worksheet is included within Detective Liguori's documents, with two split photos. The government has provided no expert notice relating to Liguori.

13.     A fourth round of reports, dated Oct. 20, 2017, is labeled "IBIS generated microscopic comparison" results. TUCKER 811-822. These reports compare cartridge casings 16-25 to a Smith & Wesson 40 caliber semi-automatic gun. Parlo concludes that these casing were discharged from the same firearm as test fires based

on the agreement of class characteristics and sufficient agreement of individual characteristics. Some photos are included. *See, e.g.,* TUCKER000811-000814.

14.     This Smith and Wessen gun was found on a person arrested on September 6, 2017 near 251 Gates Avenue in Brooklyn. ECF 18cr119, Dkt. 11. The person who was arrested with this gun is not currently charged with any crimes.

15.     There is also a firearm examination report from analyst William Brado test firing a Glock, which was the gun recovered from the complainant in this case. TUCKER 8; 780. Counsel could not find any ballistics testing reports comparing the cartridges and bullets found at the gas station to the complainant's Glock.

16.     Other than the conclusion that items 16-25 were discharged from the gun recovered on someone who is not charged with any crime, it is not clear what other conclusions Parlo reached.

16.     In a letter dated November 30, 2018, counsel asked AUSA Turner Buford for additional discovery relating to both ballistics and DNA testing. As of today, I have not received any further discovery. As explained in a letter to your Honor on December 6, 2018, without the electronic files of both the ballistics and DNA evidence, the defense cannot engage experts to assess the conclusions of the government's experts. A letter filed today under separate cover addresses the lack of sufficient discovery relating to the DNA evidence.

Respectfully submitted,

Date:  Brooklyn, New York
       January 14, 2019                              /s/
                                         Allegra Glashausser
                                         Attorney for Mr. Tambhia Tucker
                                         Federal Defenders of New York, Inc.
                                         1 Pierrepont Plaza, 16th Floor
                                         Brooklyn, N.Y. 11201
                                         (212) 417-8739

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
UNITED STATES OF AMERICA    :

                            :

    -against-                 :

                            :

TAMBHIA TUCKER,         :

                            :      18-119 (SJ)
                            :      Oral Argument Requested

        Defendant.        :
--------------------------------------------------------X

## Memorandum of Law in Support of
## Motion to Exclude Ballistics Evidence

Allegra Glashausser
Attorney for Mr. Tambhia Tucker
Federal Defenders of New York, Inc.
1 Pierrepont Plaza, 16th Floor
Brooklyn, N.Y. 11201
(212) 417-8739

Tambhia Tucker was charged with conspiracy to commit robbery and attempted robbery, in alleged violation of 18 U.S.C. § 1951, and discharging a gun during a crime of violence, in alleged violation of 18 U.S.C. § 924 (c), for an incident that occurred at a gas station on August 14, 2017. He was arraigned in federal court on his 24th birthday, February 23, 2018. Nothing in his criminal history involved him using guns or other weapons and his most recent prior offenses were exceedingly minor – possession of marijuana, a violation, and petit larceny, a misdemeanor.

A video of the incident at the gas station at 584 Gates Avenue, shows two people with their faces covered. TUCKER302. The person the government alleges to be Mr. Tucker is wearing a white t-shirt and the other person is wearing a red t-shirt. The person in white enters a small room with a desk inside the gas station, while the person in red goes into the garage portion of the station. About four seconds later, people run out of the garage. The video shows what appears to be shots fired between the complainant, who was standing behind a car, and the man in the red shirt, as the red-shirt man runs away. The complainant was shot in his leg. A couple seconds later, once the complainant is out of view behind the car, the man in white runs away.

The government now seeks to introduce ballistics evidence related to fired cartridges and bullets that were collected after this incident.

The government may only use expert testimony if it is based on valid methods that were reliably applied. Fed. R. Evid., Rule 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

2

Regardless of the scientific validity of a method in the abstract, an expert cannot give an opinion based on a slipshod application of that method. "[W]hen it comes to expert testimony, cross-examination is inherently handicapped by the jury's own lack of background knowledge, so that the Court must play a greater role, not only in excluding unreliable testimony, but also in alerting the jury to the limitations of what is presented." *United States v. Glynn*, 578 F.Supp.2d 567, 574 (S.D.N.Y. 2008). This Court has a duty to exclude unreliable expert testimony and alert the jury to the limitations of that testimony as appropriate.

Here, the government has not met its Rule 16 obligations; cannot show that the field of ballistics identification is scientifically valid; and has not shown that Matthew Parlo conducted his examination of the ballistics evidence in a reliable manner. Accordingly, this Court should order that the government produce additional discovery and exclude or limit Parlo's testimony. Additionally, this Court should order a *Daubert* hearing.

**Background: The field of ballistics identification**

Firearms were first made one at a time by individual gunsmiths. Because they were made by hand, each gun barrel and bullet was unique enough to be identifiable. Lisa Steele, *Chapter 1: Ballistics*, *in* SCIENCE FOR LAWYERS 1, 1 (Eric York Drogan ed., 2008). In 1835, an investigator was able to match a bullet to its mold for the first time, and by 1925 the Saturday Evening Post declared that "no two revolvers or pistols ever leave precisely the same marks upon a bullet." *Id.* at 1-2.

3

But around that same time, firearms and bullets also started to be mass produced. Manufacturers standardized their processes for cutting gun barrels. With standardization, it became harder to match a specific bullet to a specific firearm. Holding on to the notion that each bullet is unique, individuals started to magnify images of bullets for examination. They searched for differences among firearms made by the same manufacturer, and even, with the early industrial era's crude machines, between firearms made right after each other using the same machines. *Id.* at 3. Soon the comparison microscope was developed so examiners could view two samples simultaneously for comparisons. *Id.* at 4.

Examiners today still rely on that method: looking. They look at cartridge cases, bullets and fragments underneath microscopes and try to discern the make and model of the firearm, and features of the bullets.

Most firearms have a barrel with spiral grooves on the inside ("a rifled barrel"). *Id.* at 16. When a bullet is fired, markings (striations) are left on the bullet as it passes through the barrel and on the cartridge as it is hit by the firing pin. *Id.* at 17. The whole field assumes that – even in 2019, when firearms and bullets are not made by individuals at all, but by complex machines – that there are characteristics "unique and consistent to one specific firearm." *Id.* at 18.

Firearms examiners use the terminology of class characteristics, subclass characteristics and individual characteristics to discuss what they see under the microscopes:

4

Class characteristics include: caliber (the diameter of a bullet), number of lands and grooves (lands are the spaces between grooves on the inside of the barrel) and direction of rifling twist. These characteristics are generally visible to the naked eye, and will be the same for any bullet fired from any firearm of the same make and model. Different manufacturers produce gun models with different numbers of grooves, different widths and depths of lands and grooves and different angles of the twist. The FBI keeps a General Rifling Characteristics file, a database organized by caliber, number and width of lands and grooves and direction of twist. *Id.* at 9, 16, 18.

Subclass characteristics are markings caused by temporary conditions in the manufacturing process, like chipped or broken tools. These characteristics may be the same on many firearms produced around the same time, but are not a permanent feature of the class.

Individual characteristics are microscopic markings that are believed to be unique and consistent to one specific firearm. The unvalidated theory of uniqueness in firearms analysis comes from the assumption that every time a barrel is produced, the cutting tools are blunted and worn, and each time a bullet is fired, the firing mechanisms within the gun leave unique marks. *Id.* at 18.

Individual examiners decide whether a particular mark is an individual mark they believe is unique to a specific firearm or a subclass mark shared by many firearms made at the same time. *Id.* at 18. When police are not sure which gun fired a bullet, they can first examine the class characteristics to infer the make and model of the

5

weapon. Then, they can use a comparison microscope to view the bullet or cartridge samples side by side and analyze the subclass and individual characteristics. COMM. ON IDENTIFYING THE NEEDS OF THE FORENSIC SCIS. CMTY., NAT'L RESEARCH COUNCIL, STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD 152 (2009).

Examiners can reach one of four results:

(1) identification: "[a]greement of a combination of individual characteristics and all discernible class characteristics where the extent of agreement exceeds that which can occur in the comparison of toolmarks made by different tools and is consistent with the agreement demonstrated by toolmarks known to have been produced by the same tool." Steele, *supra* at 19

(2) elimination: "[s]ignificant disagreement of discernible class characteristics and/or individual characteristics." *Id.*;

(3) inconclusive: "[s]ome agreement of individual characteristics and all discernible class characteristics, but insufficient for an identification;" "[a]greement of all discernible class characteristics without agreement or disagreement of individual characteristics due to an absence, insufficiency, or lack of reproducibility;" or "[a]greement of all discernable class characteristics and disagreement of individual characteristics, but insufficient for an elimination." *Id.*; or

(4) unsuitable for comparison. *Id.*

Notably, the examiner's conclusion "is not based on any quantitative standard for how many striations or marks need to match or line up." The analysis is holistic and subjective. *United States v. Monteiro*, 407 F.Supp.2d 351, 364 (D. Mass. 2006).

**Lack of consistent standards and criticisms of firearm identification**

The Association of Firearm and Took Mark Examiners (AFTE) says that examiners can give an opinion that a specific firearm was the source of a set of toolmarks when "sufficient agreement" exists in the pattern of two sets of marks. Sufficient agreement exists "when it exceeds the best agreement demonstrated between tool marks known to have been produced by different tools and is consistent with the agreement demonstrated by tool marks known to have been produced by the same tool." AFTE standards require an examiner to document their findings through notes, sketches or photographs. An examiner should also have a second examiner review their work, according to the AFTE. *Id.* When an examiner states that an identification is made, it represents the examiner's decision that "the likelihood another tool could have made the mark is so remote as to be considered a practical impossibility." Steele, *supra* at 19.

Even the AFTE acknowledges that examiners' decisions are subjective and their accuracy is highly dependent on their skill and training. NAT'L RESEARCH COUNCIL at 153. As the AFTE writes, "the decision of the toolmark examiner remains a subjective decision based on unarticulated standards and no statistical foundation for estimation of error rates." *Id.* at 153-54.

7

There is no way for the examiner to explain his or her decision numerically. "After visually comparing two bullets or cartridge cases, the examiner can offer an expert opinion as to whether they match. But they cannot express the strength of the evidence numerically, the way a DNA expert can when testifying about genetic evidence." National Institute of Standards and Technology, How Good a Match is It? Putting Statistics into Forensic Firearms Identification (Feb. 8, 2018), https://www.nist.gov/news-events/news/2018/02/how-good-match-it-putting-statistics-forensic-firearms-identification.

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) within the Department of Justice has developed the Integrated Ballistic Identification System (IBIS), which is a computer imaging system. Technicians can enter data about fired bullets and expended cartridge cases and can cross reference hits for examination by a firearms examiner. The computer system automatically compares new bullet or cartridge casings with those previously entered in the system. The system produces a short list of candidates for a match, and an examiner then examines the samples to see if there is a match. Bureau of Alcohol, Tobacco, Firearms and Explosives, Automated Firearms Ballistics Technology (Sept. 22, 2016), https://www.atf.gov/firearms/automated-firearms-ballistics-technology.[1]

---

[1] It appears from the discovery the government provided that this system was used only for items number 16-25.

8

a.  PCAST Report found that firearms examination lacked foundational validity

A President's Council of Advisors on Science and Technology 2016 report emphasized the challenges in establishing the scientific validity of a method that relies, in part, on subjective judgment. Subjective methods require careful scrutiny because their heavy reliance on human judgment means they are especially vulnerable to human error, inconsistency across examiners, and cognitive bias. *See* PRESIDENT'S COUNCIL OF ADVISORS ON SCI. & TECH., EXEC. OFFICE OF THE PRESIDENT, FORENSIC SCIENCE IN CRIMINAL COURTS: ENSURING SCIENTIFIC VALIDITY OF FEATURE-COMPARISON METHODS 49 (2016), available at https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/PCAST/ pcast_forensic_science_report_final.pdf [hereinafter PCAST] (explaining how humans may be influenced by extraneous information and external pressures about a case).

The PCAST group is an organization of scientific leaders who operated under a broad, non-partisan mandate to act as an "advisory group of the Nation's leading scientists and engineers, appointed by the President" which was "consulted about, and often ma[de] policy recommendations concerning, the full range of issues where understandings from the domains of science, technology, and innovation bear potentially on the policy choices before the President." *See* PCAST Report Preface. Members of this group included a Noble Laureate; the head of the Harvard and MIT Broad Institute, the lead author on the human genome project; and experts from

9

diverse fields such as biology, electrical engineering, computer science, medicine, natural resources and environment, astrophysical sciences, string and particle theory and aerospace.

As the PCAST report explained, a method that has "foundational validity" means that "*in principle* [the method can] be reliable." *Id.* at 56 (emphasis added). Foundational validity corresponds to Rule 702 (c), whether the testimony is based on "reliable principles and methods." The PCAST Report concluded that firearms analysis "falls short of the scientific criteria for foundational validity." because "there is only a single appropriately designed study to measure validity and estimate reliability." PCAST at 11, 112. Though "[f]irearms analysts have long stated that their discipline has near-perfect accuracy . . . sufficient studies have not been done to understand the reliability and reproducibility of the methods." *Id.* at 11. Early studies that were done were inappropriately designed to determine foundational validity and estimate reliability. "Indeed, there is internal evidence among the studies themselves indicating that many previous studies underestimated the false positive rate by at least 100-fold." *Id.* The "scientific criteria for foundational validity require more than one such study, to demonstrate reproducibility." *Id.* at 112.

The PCAST also discussed validity as applied, which corresponds to Rule 702 (d), whether the expert "has reliably applied the principles and methods to the facts of the case." It noted that if firearms analysis is ever allowed in court, the examiner must "clearly report[ ] the error rates seen in appropriately designed black-box studies

10

(estimated at 1 in 66, with a 95 percent confidence limit of 1 in 46, in the one such study to date)." *Id.* An individual firearms examiner's report could only be found valid as applied if he or she "(1) has undergone rigorous proficiency testing on a large number of test problems to evaluate his or her capability and performance, and discloses the results of the proficiency testing; and (2) discloses whether, when performing the examination, he or she was aware of any other facts of the case that might influence the conclusion." *Id.* at 113.

  b. National Academy of Sciences Reports

  "Much forensic evidence – including . . . firearm and toolmark identifications – is introduced in criminal trials without any meaningful scientific validation, determination of error rates, or reliability testing to explain the limits of the discipline." COMM. ON IDENTIFYING THE NEEDS OF THE FORENSIC SCIS. CMTY., NAT'L RESEARCH COUNCIL, STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD 107-08 (2009). With firearm and toolmark identifications, there is no determination of how "many points of similarity are necessary for a given level of confidence in the result." *Id.* at 154. There have been insufficient studies to "understand the reliability and repeatability of the methods . . . [and] additional studies should be performed to make the process of individualization more precise and repeatable." *Id.* There is no defined process of firearms analysis. The best known guidance for the field, which comes from the AFTE, does not consider or address questions about variability, reliability, repeatability, or the number of correlations

needed to achieve a given degree of confidence. *Id.* at 155. Even the fundamental assumption underlying the field of firearms identification, that every gun leaves unique marks on bullets and cartridge cases, has not been fully demonstrated. NAT'L RESEARCH COUNCIL, BALLISTIC IMAGING (2008).

## Summary of Argument

The government may only use expert testimony if it is based on valid methods that were reliably applied. Fed. R. Evid., Rule 702(d); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). Regardless of the scientific validity of a method in the abstract, an expert cannot give an opinion based on a slipshod application of that method.

"Serious deficiencies have been found in the forensic evidence used in criminal trials." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 319 (2009) (noting that "[t]he legal community now concedes, with varying degrees of urgency, that our system produces erroneous convictions based on discredited forensics"). The Supreme Court cited a report noting the "subjectivity, bias and unreliability of common tests such as . . . toolmark and firearms analysis." *Id.* at 321. The government now seeks to rely on that evidence at Mr. Tucker's trial. This Court should prohibit it from doing so.

12

## Argument

## Point I

**Firearms identification is subjective, unreliable and unverified and the government should not be allowed to introduce expert testimony from a ballistics examiner.**

The field of firearms identification is subjective, not objective, and has no validation that it produces accurate results. Here, the government has submitted an expert letter stating that it wishes to introduce the testimony of a NYPD detective about his interpretations of which bullets and cartridge casings matched each other and matched guns. Because the government has not shown that the field of ballistics identification is reliable, this Court should exclude the testimony of the firearm examiner and the introduction of evidence about the firearm identification process. Alternatively, it should hold a hearing.

**A.    Legal framework on the admissibility of expert analysis**

The admissibility of expert analysis and testimony is governed by the Federal Rules of Evidence as well as the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals* and its progeny.

Fed. R. Evid. 702 provides that: A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized

13

knowledge will help the trier of fact to understand the
evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and
methods; and

(d) the expert has reliably applied the principles and methods to
the facts of the case.

Fed. R. Evid. 702.

The proponent of expert testimony has the burden of establishing by a

preponderance of the evidence that the admissibility requirements of Rule 702 are

satisfied. *United States v. Williams*, 506 F.3d 151,160 (2d Cir. 2007); see also Fed. R.

Evid. 702 Advisory Committee's Notes, 2000 Amendments ("[T]he admissibility of all

expert testimony is governed by the principles of Rule 104(a). Under that Rule, the

proponent has the burden of establishing that the pertinent admissibility requirements

are met by a preponderance of the evidence.").

In *Daubert*, the Supreme Court held that Rule 702 requires the trial judge to

assume the role of "gatekeeper" with the task of ensuring "that an expert's testimony

both rests on a reliable foundation and is relevant to the task at hand." *Daubert v.

Merrell Dow Pharm., Inc.*, 579, 597 (1993). *See also Kumho Tire Co., Ltd. v. Carmichael*, 526

U.S. 137, 147-49 (1999) (extending *Daubert*'s holding on scientific expert testimony to

all expert testimony). The Court presented a list of factors for trial courts to consider

when determining if expert testimony should be admitted.

These *Daubert* factors are:

14

1) whether the theory or technique underlying the testimony can be and has been tested;

2) whether the theory or technique has been subject to peer review and publication;

3) the technique's known or potential error rate;

4) the existence and maintenance of standards controlling the technique's operation;

5) whether the technique has gained general acceptance within the relevant scientific community. *Daubert*, 509 U.S. at 593-94.

The *Daubert* factors apply to both established and novel techniques. *Id.* at 592 n.11 ("Although the Frye decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 701 to apply specially or exclusively to unconventional evidence."); *see also United States. v. Williams*, 506 F.3d 151, 162 (2d Cir. 2007) ("[E]xpert testimony long assumed reliable before Rule 702 must nonetheless be subject to the careful examination that *Daubert* and *Kumho Tire* require."). However, the *Daubert* factors are "meant to be helpful, not definitive," and the trial court retains the discretion to determine how to evaluate an expert's reliability on a case-by-case basis. *Kumho Tire*, 526 U.S. at 151-52. The principal consideration is whether the evidence is sufficiently reliable for presentation to the jury through expert testimony.

i.    Standard for granting evidentiary hearing

Fed. R. Evid. 104(c) requires the court to conduct an evidentiary hearing on whether a witness is qualified or evidence is admissible when "justice so requires."

15

Fed. R. Evid. 104(c). The Second Circuit has stated that *Daubert* hearings are "highly desirable to enable the parties to present expert evidence and to test credibility through cross examination." *Borawick v. Shay*, 68 F.3d 597, 608 (2d Cir. 1995); *see also Dover v. British Airways*, PLC 2017 WL 2480898, at *7 (E.D.N.Y. June 5, 2017).

**B.** **Government has not met its burden of showing that ballistics identification is foundationally valid**.

Ballistics identification evidence is only admissible if it is based on a method that is both "scientifically valid" and that "properly can be applied to the facts in issue" in a particular case. *See Daubert*, 509 U.S. at 589; *accord Kumho Tire*, 526 U.S. at 141 (same analysis applies to technical expertise). The government should be required to provide an "exhaustive foundation" for ballistics examiner testimony. *United States v. Sebbern*, 2012 WL 5989813, at *8 (E.D.N.Y. 2012). The government has not done so.

On each *Daubert* factor, ballistics identification evidence falls short. First, the very premise of firearms analysis as a field – the theory of uniqueness of firearms, bullets and cartridge cases – rests on an assumption that has not been tested. It comes from a time when bullets were hand-cut and unique, but the field simply has not reckoned with standardization and technological developments. To meet this prong, the government should be required to produce some evidence indicating that this theory of uniqueness has been tested and proven correct.

16

Second, "peer review and publication" is limited. The one black-box study on firearms identification was not published in a scientific journal and was not subject to peer review or publication. *See* PCAST at 11; 111. Other studies conducted involved "designs that are not appropriate for assessing the scientific validity or estimating the reliability of the method as practiced. *Id.* at 111.

Third, the defense is aware of only one black-box study being conducted with respect to error rates. *See* PCAST at 11. The single study estimated an error rate, but a single study estimating such an error rate is insufficient to determine a known rate of error for the field. The government should be required to produce additional evidence with respect to errors rates in the field as a whole and for the NYPD lab in particular.

Fourth, there are no uniform standards for controlling the technique's operation. Rather, an individual makes a subjective determination about an identification, based on his or her own internal compass. There is no required number of points of agreement for making an identification. There is also no requirement to acknowledge or quantify points of disagreement between samples. Therefore, an examiner would be entitled to find a few points of agreement, ignore points of disagreement between samples and simply declare an identification, without accountability to any standards.

Courts have acknowledged that ballistics is not a science. *See, e.g.*, *United States v. Glynn*, 578 F.Supp.2d 567 (S.D.N.Y. 2008) (Rakoff, J.). The court explained that "ballistics opinions are significantly subjective" and the "standard defining when an

17

examiner should declare a match-namely, 'sufficient agreement'-is inherently vague." *Id.* at 572. The court added "ballistics comparison lacks defining standards to a degree that exceeds most other kinds of forensic expertise." *Id.* at 574. Indeed, "ballistics examination not only lacks the rigor of science but suffers from greater uncertainty than many other kinds of forensic evidence." *Id.* Similarly, Judge Sweet found a failure to establish that "the theory of uniqueness on which [ballistics examiners] rel[y] has been proven as a matter of empirical science, that there is any objective standard for declaring a 'match,' or that there is any reliable basis on which [an examiner] could state the degree to which he is certain." *United States v. White*, 2018 WL 4565140, at *2 (S.D.N.Y. 2018) (limiting ballistics expert testimony).

Although courts have also previously allowed firearms examiners to testify, the awareness of the limitations of ballistics identification is recent and growing. It does not appear that courts have yet seriously considered all aspects of the field's development, or tested its reliability since the PCAST report decided it was not foundationally valid from a scientific perspective. In any event, general acceptance does not prove "an expert's testimony is reliable where the discipline itself lacks reliability, as, for example, do theories grounded in any so-called generally accepted principles of astrology or necromancy." *Kumho Tire Co.*, 526 U.S. at 151.

Because firearms identification meets none of the *Daubert* criteria, this Court should exclude testimony from the government's proposed ballistics identification expert.

18

**C.**    <u>**Government has not met its burden of showing that Parlo used reliable**</u>
<u>**methods in this case**</u>.

Even if the Court finds that the general methodology underlying the
government's expert testimony is sufficiently reliable, it must ask "whether those
principles and methods have been properly applied to the facts of the case." *See* Fed.
R. Evid. 702 advisory committee's note. Because the government has not met its
burden of showing that Parlo's method was reliable under 702(d), his testimony and
the ballistics identification process should be excluded.

The admissibility of an examiner's opinion as to the existence of an
identification is a subjective determination predicated on the examiner's experience,
and it is "essential that the examiner provide a sufficient explanation for the basis of
the opinion." *See United States v. Willock*, 696 F. Supp.2d 536, 561 (N.D. Maryland
2010). As noted by the Advisory Committee Note to Fed. R. Evid. 702:

> If the witness is relying solely or primarily on experience, then the
> witness must explain how that experience leads to the conclusion
> reached, why that experience is a sufficient basis for the opinion,
> and how that experience is reliably applied to the facts. The trial
> court's gatekeeping function requires more than simply taking the
> expert's word for it.

"The twin requirements of adequate documentation and peer review of the
primary examiner's results are said to 'ensure the reliability of the expert's results and
the testability of the opinion.'" *Willock*, 696 F. Supp.2d at 561 (citation omitted); *In de
Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994) (explaining that "any step
that renders the analysis unreliable . . . renders the expert's testimony inadmissible.

19

This is true whether the step completely changes a reliable methodology or merely misapplies that methodology"); *United States v. Green*, 405 F. Supp. 2d 104, 108 (D. Mass. 2005) ("[r]eproducibility is an essential component of scientific reliability").

The government has not met that burden here.

Instead, although Parlo made conclusions regarding many bullets, cartridge cases and fragments, only a handful of photographs are included in his reports. He also did not, in any notes, sketches or photographs, explain the basis for his determinations that items of evidence met definitions for identification, elimination, inconclusivity or unsuitability. As the PCAST Report explains, the examiner should have "provide[d] a written analysis explaining the selection and comparison of features." PCAST Report at 10. In *Monteiro*, 407 F.Supp.2d at 374-75, the court excluded the testimony of a firearms examiner who failed to adequately document the basis for his findings, or to subject the findings to peer review.

Validity as applied also requires a showing that a second examiner verified and reviewed Parlo's work. *See, e.g, Monteiro*, 407 F.Supp.2d at 374-75 (stating that testimony was not admissible until works was reviewed by a second examiner). Here, a second examiner is listed in limited places, but there is no indication he or she did a full analysis, and the government has provided no information about that person.

Finally, the PCAST Report also notes that validity as applied would require "that an expert testifying on firearms analysis (1) has undergone rigorous proficiency testing on a large number of test problems to measure his or her accuracy and

20

discloses the results of the proficiency testing and (2) discloses whether, when performing the examination, he or she was aware of any other facts of the case that might influence the conclusion." *Id.* at 12. The defense has to date been provided no information regarding Parlo's proficiency testing, if any, or whether he was aware of any facts of this case when performing his examination.

Thus, for this reason as well, Parlo's testimony should be excluded.

*    *    *

Alternatively, this Court should hold a *Daubert* hearing to require that the government prove that Parlo's testimony will be reliable before admitting the testimony. Courts often require hearings before admission of this type of testimony. *See, e.g.*, *Glynn*, 578 F.Supp.2d 567; *Green*, 405 F.Supp.2d 104. In *Green*, the court was critical of courts admitting firearm identification testimony, "sometimes without any searching review, much less a hearing." *Id.* at 108. The court declared, "the standards should be higher than were met in this case, and than have been imposed across the country. The more courts admit this type of toolmark evidence without requiring documentation, proficiency testing, or evidence of reliability, the more sloppy practices will endure; we should require more." *Id.* Courts should not simply admit that testimony without careful evaluation and have an important gatekeeping role.

21

**Point II**

**If admitted, Parlo's testimony must be limited**.

There is a serious danger that a jury will be swayed by expert testimony if not made aware of the limitations on the methodology being used, particularly in a case like this one, in which the limitations are extensive. If this Court allows Parlo's testimony, therefore, it must carefully limit it.

The PCAST advises that if an expert testifies as to ballistics analysis, the jury must be made clear of the limitations of that expert's testimony. The report recommends that when courts do allow firearms expert testimony, "the scientific criteria for validity as applied should be understood to require clearly reporting the error rates seen in the one appropriately designed black-box study." PCAST Report at 12. The jury should be made aware of the error rates in the black-box study, of the fact that there has only been one appropriately designed black-box study on ballistics identification and of the fact that that study has not been published in a scientific journal. The study found a false positive rate of 1 in 66, with a confidence bound indicating that the rate could be as high as 1 in 46. *Id.* at 11. Further, a jury ought to be made aware that the foundational validity of firearms analysis as a field has not been established.

Even before the PCAST, courts have consistently limited firearm's expert testimony. In *United States v. Ashburn*, 88 F.Supp.3d 239 (E.D.N.Y. 2015), the expert was prohibited from testifying that he was "certain" or "100%" sure that two items

matched, that a match was to "the exclusion of all other firearms in the world," or that there was a "practical impossibility" that any other gun could have fired the recovered materials. In *Gylnn*, the court restricted an expert's opinion to a statement that a match was "more likely than not." *Glynn*, 578 F.Supp.2d at 575. Similarly, in *White*, 2018 WL 4565140, at *3, the expert was prevented from testifying to any specific degree of certainty as to his conclusion that there was a ballistics match. *See also United States v. Gil*, 680 Fed. Appx. 11, 14 (2d Cir. 2017) (upholding district court's decision to allow an expert to testify to conclusions based on a "reasonable degree of certainty in the field of ballistics").

Courts in other districts agree. *See*, *Monteiro*, 407 F.Supp.2d at 375 (limiting expert's opinion to testimony that cartridge cases were fired from a particular firearm to a "reasonable degree of ballistic certainty," not that there was a match to an exact statistical certainty); *Green*, 405 F.Supp.2d at 124 (preventing testimony that analysis permits "the exclusion of all other guns"); *Willock*, 696 F.Supp.2d at 574 (prohibited expert from saying that it was a "practical impossibility" that any other firearm fired the cartridges); *United States v. Diaz*, 2007 WL 485967, at *14 (N.D. Cal. 2007) (prevented experts from testifying to their conclusions "to the exclusion of all other firearms in the world" and have allowed only testimony to a "reasonable degree of certainty in the ballistics field").

Accordingly, if the Court allows Parlo to testify, the Court should carefully circumscribe his testimony.

23

## Point III

## The government should produce additional discovery to
## allow the defense to consult with its own expert.

A firearms examiner ought to document, "with notes, photographs, or sketches the conclusions reached in sufficient detail to permit" confirmation by a second examiner "and, at trial, challenge by a defense expert is one has been engaged for this purpose." *Willock*, 696 F.Supp.2d at 569-70. This documentation either was not conducted (*see* Point I, C, *supra*) or has not been disclosed to the defense.

Defense counsel requested additional discovery relating to the ballistics testing files on November 30, 2108, but as of today has not received any electronic files, clear photographs, or additional information. Without the full electronic file, the defense cannot engage experts to assess the conclusions of the government's experts. The defense should be given the opportunity to locate experts of its own who could, "[i]f the evidence is deficient . . . enable the court to exclude the evidence, or the experts will be able to rebut it at trial." *Willock*, 696 F.Supp.2d at 570. *See also United States v. Cerna*, 2010 WL 3448528 (N.D. Cal. 2010) (requiring additional discovery to ensure that an expert properly applied identification methods and based conclusions on sufficient facts or data).

Finally, the Court should require that the government provide a fuller explanation of what it expects Parlo will testify about, which is currently unclear. The government's expert disclosure letter states only that Parlo will testify "regarding,

among other things, his examination and comparison of ballistics evidence, including his observations and conclusions with respect to ammunition and shell casings recovered from the scene." The government should be required to explain the testimony in more than generalities.

## Conclusion

For the foregoing reasons, this Court should conclude that the government's ballistics evidence is inadmissible, or alternatively, should be limited as discussed above. Additionally, the Court should order the government produce additional discovery and detail about the proposed expert's testimony.


Respectfully submitted,

Date:  Brooklyn, New York
       January 14, 2019                                    _____/s/
                                                   Allegra Glashausser
                                                   Attorney for Mr. Tambhia Tucker
                                                   Federal Defenders of New York, Inc.
                                                   1 Pierrepont Plaza, 16th Floor
                                                   Brooklyn, N.Y. 11201
                                                   (212) 417-8739