UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
UNITED STATES OF AMERICA          :
                                  :
     -against-                    :
                                  :
TAMBHIA TUCKER,                   :
                                  :          18-119 (SJ)
                                  :
          Defendant.              :
--------------------------------------------------------X


**Post-Hearing Memorandum of Law in Support of
Motion to Exclude Expert Testimony**

Allegra Glashausser
Attorney for Mr. Tambhia Tucker
Federal Defenders of New York, Inc.
1 Pierrepont Plaza, 16th Floor
Brooklyn, N.Y. 11201
(212) 417-8739

Preliminary Statement

Tambhia Tucker was charged with conspiracy to commit robbery and attempted robbery, in alleged violation of 18 U.S.C. § 1951, and discharging a gun during a crime of violence, in alleged violation of 18 U.S.C. § 924 (c), for an incident that occurred at a gas station on August 14, 2017. On January 14, 2019, the defense moved to exclude the government's proposed expert testimony relating to the ballistics evidence. On June 18, 2019, Your Honor held a *Daubert* hearing to address the admissibility of this testimony, at which Detective Matthew Parlo testified for the government and John Nixon testified for the defense.

This brief is submitted in support of the defense motion to exclude.[1]

---

[1] Attached to this brief are the following exhibits:

    Ex. A:  The AFTE "theory of identification"
    Ex. B:  Excerpts from Strengthening Forensic Science in the United States: A Path Forward, the National Academy of Sciences Report
    Ex. C:  Excerpts from PCAST
    Ex D:  NYPD Firearms Section Procedure Manual – Fired Evidence Examination
    Ex. E:  John Nixon's resume

Introduction

How many guns were fired on the day of the crime? At the hearing, Detective Matthew Parlo admitted he does not know. He said it could have been 3, 4, 5, 6 … up to 30 different guns. How did he decide the number was at least 3? Parlo testified that he based that conclusion on the different sizes of the "groove impressions," but then he admitted he did not measure the sizes of the groove impressions. What technique did he use to reach this conclusion? He testified that he relied on the "consecutively matching striae technique," a theory neither mentioned nor defined by the government in their briefing in support of his testimony. On this record, the government failed to meet their burden under *Daubert* of presenting evidence about the reliability, peer review, error rate, and standard acceptance of a particular technique. Additionally, the government failed to show that Parlo – who testified that he made his conclusions based on the different sizes of the impressions, but failed to measure the sizes – reliably applied any valid method. For either of these reasons, he should not testify as an expert at Mr. Tucker's trial.

Alternatively, based on the government's representations that it does not plan to have Parlo testify about his conclusions that certain bullets came from the same gun, while others came from a different gun, much of what the government does wish to introduce through Parlo does not require any special expertise. For example, Parlo – or another witness – may testify that there were two different caliber bullets at the

2

scene, based on the clear, and readily apparent, stamps on some shell casings with "9 mm" and others with "40." That is lay testimony that any witness can provide.

Accordingly, the defense motion should be granted and the government's request to have Parlo testify as an expert, denied.

Facts

Detective Matthew Parlo has a two-year associate's degree in using computers in business environments, that he completed in three years. This degree did not involve the studies that underline ballistics examination, including the study of metals, the friction of metals, and the mechanics of metals. H. 54. Instead, he completed a NYPD firearm examiner training program, based on the techniques of the Association of Firearm and Tool Mark Examiners and has worked in the firearms analysis section of the NYPD. H. 6-7. He testified that his ongoing training involved taking competency or proficiency tests, which he claimed were "representative of case work" and as "close to case work as they would make it." H. 8. On cross-examination, however, he explained that, during testing, he receives only complete, whole bullets, and can always measure their full weight and diameter. H. 57. In his real work, as in this case, he receives fragmented and deformed bullets. H. 56-57.

He decided bullets were fired from different guns based on "different size[s] in the groove impressions," but did not measure the size of any groove impressions.

Parlo testified that he concluded that the bullet fragments recovered in this case were from different guns based on "different size[s] in the groove impressions." H. 32. He added that he was "able to tell" that the bullets were fired from different guns

3

by the "size of the land and grove impressions." H. 34. The "lands and grooves" are the "high and low spots." H. 23.



He elaborated, saying that the size was "significant" because the bullets are "manufactured with a certain size land and groove impression" these are "set sizes" that "don't move throughout the life of the firearm." H. 34. He concluded, "if you have different size lands and grooves, then you have different firearms that fire them." H. 34.[3]

---

[2] Picture introduced at hearing as defense exhibit A.

[3] Although Parlo stated that the "size of the lands and grooves" was "documented," when asked on direct examination to point to the section with that documentation, he did not. Instead, the following exchange occurred:

> Q. Is that conclusion about the difference in size between lands and grooves documented in your report?
>
> A. Yes.
>
> Q. Where?
>
> A. When I state that they were of different caliber class.

4

On cross examination, however, Parlo testified that he did not measure the depths of the grooves or the widths of the lands. H. 49-50. Indeed, he did not measure any of the marks on any of the items he reviewed in this case. H. 50. He said that his direct testimony about relying on the sizes of the lands and the grooves did not refer to any "specific measurement." H. 50. Instead of making measurements, he said he "physically compared them using the comparison microscope." H. 50.

On redirect he said that, despite basing his conclusions on the relative sizes of the lands and the grooves, that the "only benefit of measuring the lands and the grooves is to put it into the general rifling database." H. 75. The "general rifling database" "would allow [Parlo] to input measurements of the lands" and the "grooves" and would "run an analysis based on those measurements." H. 52. Although the utilization of this database was is part of the NYPD manual procedures, Parlo said he does not use this database "on a regular basis." H. 53.

---

Q. But, setting aside the caliber, when you are talking about the size of the lands and grooves, is that conclusion document?

A. Yes.

Q. Where.

A. That is on page 3 of 7…Where—if you look at my conclusions, I base the polygonals to two separate sets. H. 35.

5

<u>What technique did he use?</u>

On direct, Parlo described "tool mark analysis," as the use of a "comparison microscope to view a softer object that has either impressed or a striated mark by a much harder object, or the tool." H. 11. When asked to describe generally what he did in this case, he said that he "followed [his] standard operating procedure to list the evidence, to identify the evidence, and then conduct a microscopic comparison of the evidence." H. 16. He stated that the "type of analysis," was a "microscopic analysis," based on "[his] microscopic comparison of the evidence." H. 18.

Although he was trained in the Association of Firearms and Tool mark Examiners ("AFTE") technique, which relies on a "theory of identification," Parlo said that he "follow[ed] NYPD standard operating procedure," rather than AFTE. H. 43. He further stated that his "training was based on the Association of Firearm Tool Mark Examiners training program, but it is not an exact replica of it." H. 44. He relies on the AFTE "theory of identification," only in "some cases." H. 44.

On cross-examination, for the first time, he started saying that he used a "quantitative consecutively matching striae criteria," a technique that was not mentioned in the government's briefing on this case, *see* Dkt. 37, in Parlo's case notes, nor in his direct examination about his analysis. Nonetheless, on cross-examination he repeatedly stated that he used that technique. H. 48, 61, 66, 73. "Striae" is just a big word for "line." H. 45. The phrase, while sounding complex, actually means

6

"matching lines" that are, presumably, next to each other. H. 45. Neither Parlo nor the government explained what this "criteria" was.

When asked if he marked any of those "striae," he said no and he could not explain which lines he compared. H. 73. He made no notes about how many "striae" or lines he compared. H. 73. He "could just say that [the marks on a bullet] exceeded the criteria," or it "didn't exceed the criteria." H. 73.

Although he denied relying on the AFTE theory of identification in this case, his case notes used the terminology from the AFTE theory of identification, saying that various bullet fragments had "sufficient agreement." H. 36, 45-46. "Sufficient agreement" is defined in the theory of identification as of "similar quantity and quality." H. 46. "Quality and quantity aren't defined." H. 47. He testified that he does not look at any specific number of marks to or characteristics to conclude agreement is "sufficient." H. 48. When asked about the theory of identification, he repeated that he used the consecutively matching striae criteria, which remained undefined, even after his redirect examination.

Testimony about rifling types: polygonal rifling is "smoother, if you were to rub your finger across it."

Parlo also testified that he relied on "rifling" types to separate groups of bullets: polygonal and conventional. "Rifling" is "impressed onto th[e] bullet from the firearm." H. 15. The difference between polygonal and conventional rifling is how deep the grooves are. Conventional rifling involves "those high and low spots that are

7

cut into that metal using a cutting tool, like a broach. Polygonal rifling is a hammer-forged rifling, and it's hammer forged around the mandible. So, instead of having those high land and groove markings, it will have what are called hills and valleys, or very subtle high and low spots." H. 24. He explained that polygonal rifling is "smoother, if you were to rub your finger across it." H. 51.

Although he testified that the differences in rifling type were related to the depths of the grooves, he also said that there is no specific measurement of how "shallow a valley is in a polygonal rifling" and "no specific measurement of the slope of the hill." H. 51. Conversely, there is no measurement for how deep a grove needs to be for it to be labeled conventional. H. 52. Conventional rifling can be of different depths. H. 52.

The differences in these unmeasured rifling depths led him to conclude that there were at least three guns on the scene, H. 27, 30-31 (items 9-11 were "polygonally rifled" while 12-15 were "conventionally rifled"). In support of this conclusion, Parlo also testified about the different caliber bullets at the scene, stating that there were .40 caliber, .38 caliber, and 9 mm bullet casings and fragments. However, he then admitted that bullets that are 9 mm and those that are .38 caliber have the "same diameter." H. 71. Parlo did not explain why he reported that there were three calibers of bullets given that 9 mm and .38 caliber are the same size.

With respect to his conclusion related to the .40 caliber and 9 mm bullets, there were two sets of cartridge casings, one stamped "9mm" and the other stamped "40."

No special training is needed to see that there are 9mm casings and 40 caliber casings because the numbers are stamped on the casing themselves. H. 70-71. There was no third set of cartridge casings of a third caliber. H. 71. A "larger firearm [could] fire" a "smaller bullet." H. 33. If a smaller bullet was fired from a larger firearm the "rifling would not" be "impressed on the whole way around the bullet." H. 33. Parlo did not discuss if he looked for this type of rifling in the evidence he examined, or whether the size of the fragments in the evidence he examined allowed him to determine whether or not rifling was impressed on the "whole way around the bullet."

Parlo cannot say how many guns produced the evidence

Before the hearing, the government represented that the key piece of information it intended to elicit from Parlo related to how many guns produced the bullet fragments and casings that were at the scene. H. 3. On this point, Parlo testified that there could have been 3, 4, 5, 6 or many more guns that produced the evidence on the scene. H. 68-69. He did not know the maximum number. H. 68-69. Unless he relied on individual characteristics, the maximum number of guns would be closer to 30. H. 69.

Reports that the field of tool mark comparison is not "scientifically valid."

John Nixon, a defense expert with vast scientific, engineering, and firearms experience, testified about two reports, the President's Council of Advisors on Science and Technology (PCAST) report and National Academy of Sciences (NAS) report. Both of these reports call into question the underlying validity of the

9

assumptions made by firearms examiners that guns produce unique markings and that examiners are able to reliably match bullet fragments in their real life case work. The NAS report was commissioned by the U.S. Congress, and written by "world leaders in science, technology, and jurisprudence." H. 83-84. The report stated that the field of forensics ballistics examination has always "assumed that every ammunition component fired through a firearm has unique markings on it that relate to that firearm." H. 85-86. The NAS report, however, concluded that this "concept of discernible uniqueness has not been adequately demonstrated." H. 85. Adding further support to the NAS conclusion, Nixon added that a 2007 study showed that two cartridge casings fired from two different guns appeared to examiners to have been fired from the same gun. H. 86.

The NAS report also talked about how the "theory of identification" is "circular and confusing," criticized the lack of "statistical foundation for [any] error rates," and the examiners' lack of education background in the relevant fields. H. 87. The PCAST report, which was similarly drafted by world-leading scientists and technologists, agreed with the NAS findings. H. 89. The PCAST concluded that, without further research and study, the foundation upon which tool mark examination is based is not valid. H. 93.

Rather than engage with criticisms of his field from these two significant reports, Parlo dismissed both as "failed report[s]" because they did not mentioned the "consecutively matching striae criteria," the technique that Parlo did not explain,

10

define, or document in his case analysis. H. 66. In Nixon's view, the field of firearm tool mark analysis had not changed in reaction to the reports. H. 95. Nixon, recognizing the limitations in the field, reports his opinion about whether bullets came from the same gun only as "more likely than not." H. 98. Sensibly, Nixon said that "as new information becomes available you have to be prepared to amend your opinions." H. 99.

Nixon also testified about a case from New Mexico, in which an experienced ballistics examiner made an error in determining a bullets' class characteristics. H. 96-97. In *Kerns,* the examiner, a "respected member of [AFTE] a national professional group," determined that a bullet that shot down a helicopter could have come from a particular rifle. *Kerns v. Bader,* 663 F.3d 1173 (10th Cir. 2011) (civil case addressing qualified immunity of the officials involved in prosecuting the wrong person). A forensic expert hired by Mr. Kerns found that the "report was sorely mistaken—and soon [the original examiner] admitted that Mr. Kerns's [ ] rifle could not have been the one that shot the helicopter" and the case was dismissed. *Id.* at 1179–80. The person who had made the mistake in *Kerns* had passed his proficiency tests and had been voted as AFTE's "man of the year." H. 97. Parlo, who claimed that errors could not be made in class characteristics, stated he was unfamiliar with this case. H. 49, 72.

Although the government questioned Nixon about a civil dispute he had with AFTE, Parlo, the government's witness, was also not accepted for AFTE membership. H. 74. This has nothing to do with Nixon's professional scientific

11

qualifications nor his testimony related to the PCAST and NAS reports and the

limitations of the field of tool mark analysis.[4]

## Argument

**Parlo should not be permitted to testify as an expert because the government has not met its burden of showing the testimony would be based on reliable methods.**

A.    <u>The government failed in its burden to show Parlo's testimony was based on a valid, reliable technique</u>.

It is the government's burden to show that the field of expertise that Det. Parlo

seeks to testify about is reliable under *Daubert* and Federal Rules of Evidence, Rule

702. *United States v. Williams*, 506 F.3d 151,160 (2d Cir. 2007); *see also* Fed. R. Evid. 702

Advisory Committee's Notes, 2000 Amendments ("[T]he admissibility of all expert

testimony is governed by the principles of Rule 104(a). Under that Rule, the

proponent has the burden of establishing that the pertinent admissibility requirements

are met by a preponderance of the evidence."). They have not met that burden.

The defense introduced evidence through an expert witness, and two expert

reports commissioned by Congress and the President stating that the field of firearm

---

[4] The Seventh Circuit described Nixon's numerous qualifications, explaining he worked "as an expert witness in firearms and ballistics for the past twelve years, four on behalf of the British government. He is a past president of the Indiana Society of Professional Engineers, and has been involved in more than 200 legal proceedings and testified as an expert approximately 80 times on issues that include wound ballistics, trajectory, cartridge-case ejection, tool marks, firearm and ammunition identification, and distance determination." *Nixon v. Haag*, 497 F. App'x 659, 660 (7th Cir. 2012).

tool mark analysis is not foundationally valid. Meanwhile, the government made no effort to introduce evidence that the technique was valid, evidence relating to the *Daubert* factors, or the Rule 702 factors.[5] The government's evidence is lacking on each *Daubert* factor:

1.    It is not clear what "theory" or "technique" Parlo relied on or whether it has been tested.

After the hearing, it remained unclear which technique Parlo had relied on, or indeed which technique the government is seeking to prove sufficiently reliable to be admissible as a basis for expert testimony. Although Parlo said he was trained in the AFTE theory of identification, he also disavowed it, saying that he "follow[ed] NYPD standard operating procedure," rather than AFTE, and did not rely on the AFTE

---

[5] The *Daubert* factors are:

>    1)  whether the theory or technique underlying the testimony can be and has been tested;
>
>    2)  whether the theory or technique has been subject to peer review and publication;
>
>    3)  the technique's known or potential error rate;
>
>    4)  the existence and maintenance of standards controlling the technique's operation;
>
>    5)  whether the technique has gained general acceptance within the relevant scientific community. *Daubert*, 509 U.S. at 593-94.

Similarly, the Federal Rules of Evidence, Rule 702 (c) requires that the testimony is based on "reliable principles and methods," and Rule 702(d) requires that the expert "reliably applied the principles and methods to the facts of the case."

13

theory in this case. H. 43-44. He further stated that his "training was based on the Association of Firearm Tool Mark Examiners training program, but it is not an exact replica of it." H. 44.

Instead, Parlo said that, in this case, he relied on the "consecutively matching striae" technique or criteria. H. 43. The government introduced no evidence about what that technique is and whether or not it is reliable. The government has also produced no documentation that Parlo used the consecutively matching striae technique here: it is noted nowhere in his reports, nor could Parlo point to anything in his reports stating that he relied on that technique. On the contrary, his reports used the language of the AFTE theory of identification, of "sufficient agreement."

In the one case in our circuit to mention the "consecutively matching striae" technique, *United States v. Glynn*, 578 F. Supp. 2d 567, 574 (S.D.N.Y. 2008), the court said that it was an "attempt[ ]" "made to introduce [ ] minimum standards and protocols" into ballistics analysis, but that it had "not yet met with general acceptance." Confusingly, although *Glynn* called the technique new, according to Parlo's testimony, it was "established" "from 1955 to 1958" and "reexamined in 1997." H. 45.

Given the lack of information the government has introduced about the technique, they have not met their burden in showing that it "can be and has been" tested.

14

2.      The government introduced no evidence about peer reviewed publications relating to the consecutively matching striae technique.

Similarly, the government made no attempt at the hearing to meet its burden on the peer review factor. It its initial briefing, it focused on peer review concerning the "AFTE methodology." *See* Gov. Br. at 12. It introduced no information in its briefing or at the hearing related to peer review of the consecutively matching striae technique. In contrast, the defense introduced two major reports criticizing the field of tool mark examination.

3.      One study of an error rate is not sufficient.

The government also did not attempt to meet its burden of showing the technique has a known error rate. The PCAST reported that only one study made an adequate analysis of error rates and, in that study, errors occur 1 out of 46 times. The government sought neither to bolster nor undercut this one study. One study is not sufficient to show that there is a known error rate. As PCAST explained, more studies are necessary.

4 & 5. The government introduced no evidence about any standards for the consecutively matching striae technique or evidence of general acceptance of the technique.

The government introduced no evidence of uniform standards or general acceptance of Parlo's technique, which involved comparing sizes of markings on the bullets without measuring the sizes of those markings. Indeed, it does not appear that Parlo even followed the standards in the NYPD Firearms Analysis Section manual,

15

which has a three-step procedure for "fired bullet examination." *See* Manual, 6.5.3 (attached to this motion). The second step is to use the General Rifling Characteristics database to "look up the physical characteristics of a bullet to determine a list of possible firearms that could have fired it," using four possible factors, including the "width of lands/grooves." *Id.* Parlo, however, did not use that database.

*    *    *

Because the government failed to introduce sufficient evidence on any of the *Daubert* factors, the government has not met its burden.

B.  <u>The government has not proved that Parlo's methods in this case were reliable.</u>

The government has also failed in its burden to show that Parlo reliably applied any particular principles or methods to this case. Parlo didn't measure, he hasn't participated in any proficiency testing that mimics his field work, he did not document the method he used or how he reached his conclusions, and he failed to take into account valid criticisms of his field to improve his work. For these reasons too, he should not be permitted to testify as an expert.

First, the government seeks to have Parlo testify that his determinations were based on the different sizes in the land and groove impressions. But he did not even measure those sizes. Second, Parlo's "proficiency" testing is nothing like the work he did in this case. His testing involved comparing whole, intact, test-fired bullets. The

16

test-fires in this case in comparison to the fragments he analyzed in this case make clear how different that is. The test fires look like this:



The actual evidence from the scene was fragmented and deformed:



Third, he failed to adequately document his work. He didn't write down the technique he used and the markings he saw, and he didn't photograph the majority of the pieces of evidence he examined. Finally, that he has not reacted to criticisms of his field at all, but just dismissed two major reports, written by Nobel Laureates and top scientific experts as "failed," should give the Court serious concern. An inability to

17

recognize one's own shortcomings, and adapt to changes in the field, raises the risk of unreliable, erroneous work.

For this reason too, his testimony should be excluded.

C.      <u>Based on the government's statement about the limited information Parlo will testify about, Parlo need not testify as an expert</u>.

The government has indicated that it does not intend to have Parlo testify about individual characteristics on the bullets, to match the bullets to particular guns, or to match them to each other. Given this, it would seem that the anticipated testimony would be only be about the rifling type and the caliber sizes. If the government wishes to have someone testify that some of the bullet fragments feel "smoother" than others, based on different types of rifling, an expert is not necessary. The jury, like Parlo, can "feel with [their] fingers" that some of the bullets are smoother than others. Similarly, the jury can read the stamps on one set of bullets with "40" and the other with "9." They do not need an expert witness to tell them that the cartridges are stamped with different numbers:

18




That is not testimony that is based on any specialized knowledge, but is lay testimony.

*See e.g., United States v. Amador-Huggins*, 799 F.3d 124, 130 (1st Cir. 2015) (testimony by

FBI agent about bumpers was "rationally based on the witness's perception," Fed. R.

Evid. 701(a), "acquired in the course of his work as an FBI agent."); *United States v.*

*Mejia*, 545 F.3d 179, 191 (2d Cir. 2008) (in context of drug trafficking experts, noting

"we have carefully circumscribed the use of such testimony to occasions where the

subject matter of the testimony is beyond the ken of the average juror.").

19

## Conclusion

For the foregoing reasons, and those in Mr. Tucker's original motion to exclude, this Court should conclude that the government's ballistics testimony is inadmissible, or alternatively, should be limited as discussed in the main briefing.

Respectfully submitted,

Date: Brooklyn, New York
   July 19, 2019

               /s/

Allegra Glashausser
Attorney for Mr. Tambhia Tucker
Federal Defenders of New York, Inc.
1 Pierrepont Plaza, 16th Floor
Brooklyn, N.Y. 11201
(212) 417-8739