# Exhibit A

# AFTE Theory of Identification as it Relates to Toolmarks

1. The theory of identification as it pertains to the comparison of toolmarks enables opinions of common origin to be made when the unique surface contours of two toolmarks are in "sufficient agreement".

2. This "sufficient agreement" is related to the significant duplication of random toolmarks as evidence by the correspondence of a pattern or combination of patterns of surface contours. Significance is determined by the comparative examination of two or more sets of surface contour patterns comprised of individual peaks, ridges and furrows. Specifically, the relative height or depth, width, curvature and spatial relationship of the individual peaks, ridges and furrows within one set of surface contours are defined and compared to the corresponding features in the second set of surface contours. Agreement is significant when the agreement in individual characteristics exceeds the best agreement demonstrated between toolmarks known to have been produced by different tools and is consistent with agreement demonstrated by toolmarks known to have been produced by the same tool. The statement that "sufficient agreement" exists between two toolmarks means that the agreement of individual characteristics is of a quantity and quality that the likelihood another tool could have made the mark is so remote as to be considered a practical impossibility.

3. Currently the interpretation of individualization/identification is subjective in nature, founded on scientific principles and based on the examiner's training and experience.


DEFENDANT'S EXHIBIT

# Exhibit B

DEFENDANT'S
EXHIBIT

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

*150*        *STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES*

work in laboratories that conduct hundreds or thousands of evaluations of impression evidence develop useful experience and judgment, it is difficult to assert that the field has enough collective judgment about the variabilities in lip prints and ear prints based on tens of examinations. The community simply does not have enough data about the natural variability of those less frequent impressions, absent the presence of a clear deformity or scar, to infer whether the observed degree of similarity is significant.

Most of the research in the field is conducted in forensic laboratories, with the results published in trade journals, such as the *Journal of Forensic Identification*. With regard to reporting, SWGTREAD is moving toward the use of standard language to convey the conclusions reached.[58] But neither IAI nor SWGTREAD addresses the issue of what critical research should be done or by whom, critical questions that should be addressed include the persistence of individual characteristics, the rarity of certain characteristic types, and the appropriate statistical standards to apply to the significance of individual characteristics. Also, little if any research has been done to address rare impression evidence. Much more research on these matters is needed.

## TOOLMARK AND FIREARMS IDENTIFICATION

Toolmarks are generated when a hard object (tool) comes into contact with a relatively softer object. Such toolmarks may occur in the commission of a crime when an instrument such as a screwdriver, crowbar, or wire cutter is used or when the internal parts of a firearm make contact with the brass and lead that comprise ammunition. The marks left by an implement such as a screwdriver or a firearm's firing pin depend largely on the manufacturing processes—and manufacturing tools—used to create or shape it, although other surface features (e.g., chips, gouges) might be introduced through post-manufacturing wear. Manufacturing tools experience wear and abrasion as they cut, scrape, and otherwise shape metal, giving rise to the theory that any two manufactured products—even those produced consecutively with the same manufacturing tools—will bear microscopically different marks. Firearms and toolmark examiners believe that toolmarks may be traced to the physical heterogeneities of an individual tool—that is, that "individual characteristics" of toolmarks may be uniquely associated with a specific tool or firearm and are reproduced by the use of that tool and only that tool.

The manufacture and use of firearms produces an extensive set of

---

[58] SWGTREAD. 2006. *Standard Terminology for Expressing Conclusions of Forensic Footwear and Tire Impression Examinations.* Available at www.theiai.org/guidelines/swgtread/terminology_final.pdf.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.
Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

*FORENSIC SCIENCE DISCIPLINES*                                           *151*

specialized toolmarks. Gun barrels typically are rifled to improve accuracy, meaning that spiral grooves are cut into the barrel's interior. The process of cutting these grooves into the barrel leaves marks and scrapes on the relatively softer metal of the barrel.[59] In turn, these markings are transferred to the softer metal of a bullet as it exits the barrel. Over time, with repeated use (and metal-to-metal scraping), the marks on a barrel (and the corresponding "stria" imparted to bullets) may change as individual imperfections are formed or as cleanliness of the barrel changes. The brass exterior of cartridge cases receive analogous toolmarks during the process of gun firing: the firing pin dents the soft primer surface at the base of the cartridge to commence firing, the primer area is forced backward by the buildup of gas pressure (so that the texture of the gun's breech face is impressed on the cartridge), and extractors and ejectors leave marks as they expel used cartridges and cycle in new ammunition.

Firearms examination is one of the more common functions of crime laboratories. Even small laboratories with limited services often perform firearms analysis. In addition to the analysis of marks on bullets and cartridges, firearms examination also includes the determination of the firing distance, the operability of a weapon, and sometimes the analysis of primer residue to determine whether someone recently handled a weapon. These broader aspects are not covered here.

### Sample and Data Collection

When a tool is used in a crime, the object that contains the tool marks is recovered when possible. If a toolmark cannot be recovered, it can be photographed and cast. Test marks made by recovered tools can be made in a laboratory and compared with crime scene toolmarks.

In the early 1990s, the FBI and the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) developed separate databases of images of bullet and cartridge case markings, which could be queried to suggest possible matches. In 1996, the National Institute of Standards and Technology (NIST) developed data exchange standards that permitted the integration of the FBI's DRUGFIRE database (cartridge case images) and the ATF's CEASEFIRE database (then limited to bullet images). The current National Integrated Ballistic Information Network (NIBIN) includes images from both cartridge cases and bullets that are associated with crime scenes and is maintained by the ATF.

Periodically—and particularly in the wake of the Washington, DC,

---

[59] Although the metal and initial rifling are very similar, the cutting of the individual barrels, the finishing machining, and the cleaning and polishing begin the process of differentiation of the two sequentially manufactured barrels.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

*152*        *STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES*

sniper attacks in 2002—the question has been raised of expanding the scope of databases like NIBIN to include images from test firings of newly manufactured firearms. In concept, this would permit downstream investigators who recover a cartridge case or bullet at a crime scene to identify the likely source firearm. Though two states (Maryland and New York) instituted such reference ballistic image databases for newly manufactured firearms, proposals to create such a database at the national level did not make substantial progress in Congress. A recent report of the National Academies, *Ballistic Imaging*, examined this option in great detail and concluded that "[a] national reference ballistic image database of all new and imported guns is not advisable at this time."[60]

### Analyses

In both firearm and toolmark identification, it is useful to distinguish several types of characteristics that are considered by examiners. "Class characteristics" are distinctive features that are shared by many items of the same type. For example, the width of the head of a screwdriver or the pattern of serrations in the blade of a knife may be class characteristics that are common to all screwdrivers or knives of a particular manufacturer and/or model. Similarly, the number of grooves cut into the barrel of a firearm and the direction of "twist" in those grooves are class characteristics that can filter and restrict the range of firearms that match evidence found at a crime scene. "Individual characteristics" are the fine microscopic markings and textures that are said to be unique to an individual tool or firearm. Between these two extremes are "subclass characteristics" that may be common to a small group of firearms and that are produced by the manufacturing process, such as when a worn or dull tool is used to cut barrel rifling.

Bullets and cartridge cases are first examined to determine which class characteristics are present. If these differ from a comparison bullet or cartridge, further examination may be unnecessary. The microscopic markings on bullets and cartridge cases and on toolmarks are then examined under a comparison microscope (made from two compound microscopes joined by a comparison bridge that allows viewing of two objects at the same time). The unknown and known bullet or cartridge case or toolmark surfaces are compared visually by a firearms examiner, who can evaluate whether a match exists.

---

[60] National Research Council. 2008. *Ballistic Imaging*. Washington, DC: The National Academies Press, p. 5.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

*FORENSIC SCIENCE DISCIPLINES*                                                    *153*

### Scientific Interpretation

The task of the firearms and toolmark examiner is to identify the individual characteristics of microscopic toolmarks apart from class and subclass characteristics and then to assess the extent of agreement in individual characteristics in the two sets of toolmarks to permit the identification of an individual tool or firearm.

Guidance from the Association of Firearm and Tool Mark Examiners (AFTE)[61] indicates that an examiner may offer an opinion that a specific tool or firearm was the source of a specific set of toolmarks or a particular bullet striation pattern when "sufficient agreement" exists in the pattern of two sets of marks. The standards then define agreement as significant "when it exceeds the best agreement demonstrated between tool marks known to have been produced by different tools and is consistent with the agreement demonstrated by tool marks known to have been produced by the same tool."[62]

Knowing the extent of agreement in marks made by different tools, and the extent of variation in marks made by the same tool, is a challenging task. AFTE standards acknowledge that these decisions involve subjective qualitative judgments by examiners and that the accuracy of examiners' assessments is highly dependent on their skill and training. In earlier years, toolmark examiners relied on their past casework to provide a foundation for distinguishing between individual, class, and subclass characteristics. More recently, extensive training programs using known samples have expanded the knowledge base of examiners.

The emergence of ballistic imaging technology and databases such as NIBIN assist examiners in finding possible candidate matches between pieces of evidence, including crime scene exhibits held in other geographic locations. However, it is important to note that the final determination of a match is always done through direct physical comparison of the evidence by a firearms examiner, not the computer analysis of images. The growth of these databases also permits examiners to become more familiar with similarities in striation patterns made by different firearms. Newer imaging techniques assess toolmarks using three-dimensional surface measurement data, taking into account the depth of the marks. But even with more training and experience using newer techniques, the decision of the toolmark examiner remains a subjective decision based on unarticulated

---

[61] Theory of identification, range of striae comparison reports and modified glossary definitions—An AFTE Criteria for Identification Committee report. 1992. *Journal of the Association of Firearm and Tool Mark Examiners* 24:336-340.

[62] Ibid., p. 336.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.
Copyright © National Academy of Sciences. All rights reserved.

Case 1:18-cr-00119-SJ Document 49-1 Filed 07/19/19 Page 8 of 63 PageID #: 660

standards and no statistical foundation for estimation of error rates.[63] The National Academies report, *Ballistic Imaging*, while not claiming to be a definitive study on firearms identification, observed that, "The validity of the fundamental assumptions of uniqueness and reproducibility of firearms-related toolmarks has not yet been fully demonstrated." That study recognized the logic involved in trying to compare firearms-related toolmarks by noting that, "Although they are subject to numerous sources of variability, firearms-related toolmarks are not completely random and volatile; one can find similar marks on bullets and cartridge cases from the same gun," but it cautioned that, "A significant amount of research would be needed to scientifically determine the degree to which firearms-related toolmarks are unique or even to quantitatively characterize the probability of uniqueness."[64]

### Summary Assessment

Toolmark and firearms analysis suffers from the same limitations discussed above for impression evidence. Because not enough is known about the variabilities among individual tools and guns, we are not able to specify how many points of similarity are necessary for a given level of confidence in the result. Sufficient studies have not been done to understand the reliability and repeatability of the methods. The committee agrees that class characteristics are helpful in narrowing the pool of tools that may have left a distinctive mark. Individual patterns from manufacture or from wear might, in some cases, be distinctive enough to suggest one particular source, but additional studies should be performed to make the process of individualization more precise and repeatable.

---

[63] Recent research has attempted to develop a statistical foundation for assessing the likelihood that more than one tool could have made specific marks by assessing consecutive matching striae, but this approach is used in a minority of cases. See A.A. Biasotti. 1959. A statistical study of the individual characteristics of fired bullets. *Journal of Forensic Sciences* 4:34; A.A. Biasotti and J. Murdock. 1984. "Criteria for identification" or "state of the art" of firearms and tool marks identification. *Journal of the Association of Firearms and Tool Mark Examiners* 16(4):16; J. Miller and M.M. McLean. 1998. Criteria for identification of tool marks. *Journal of the Association of Firearms and Tool Mark Examiners* 30(1):15; J.J. Masson. 1997. Confidence level variations in firearms identification through computerized technology. *Journal of the Association of Firearms and Tool Mark Examiners* 29(1):42. For a critique of this area and a comparison of scientific issues involving toolmark evidence and DNA evidence, see A. Schwartz. 2004-2005. A systemic challenge to the reliability and admissibility of firearms and tool marks identification. *Columbia Science and Technology Law Review* 6:2. For a rebuttal to this critique, see R.G. Nichols. 2007. Defending the scientific foundations of the firearms and tool mark identification discipline: Responding to recent challenges. *Journal of Forensic Sciences* 52(3):586-594.

[64] All quotes from National Research Council. 2008. *Ballistic Imaging*. Washington, DC: The National Academies Press, p. 3.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.
Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

*FORENSIC SCIENCE DISCIPLINES*          *155*

A fundamental problem with toolmark and firearms analysis is the lack of a precisely defined process. As noted above, AFTE has adopted a theory of identification, but it does not provide a specific protocol. It says that an examiner may offer an opinion that a specific tool or firearm was the source of a specific set of toolmarks or a bullet striation pattern when "sufficient agreement" exists in the pattern of two sets of marks. It defines agreement as significant "when it exceeds the best agreement demonstrated between tool marks known to have been produced by different tools and is consistent with the agreement demonstrated by tool marks known to have been produced by the same tool." The meaning of "exceeds the best agreement" and "consistent with" are not specified, and the examiner is expected to draw on his or her own experience. This AFTE document, which is the best guidance available for the field of toolmark identification, does not even consider, let alone address, questions regarding variability, reliability, repeatability, or the number of correlations needed to achieve a given degree of confidence.

Although some studies have been performed on the degree of similarity that can be found between marks made by different tools and the variability in marks made by an individual tool, the scientific knowledge base for toolmark and firearms analysis is fairly limited. For example, a report from Hamby, Brundage, and Thorpe[65] includes capsule summaries of 68 toolmark and firearms studies. But the capsule summaries suggest a heavy reliance on the subjective findings of examiners rather than on the rigorous quantification and analysis of sources of variability. Overall, the process for toolmark and firearms comparisons lacks the specificity of the protocols for, say, 13 STR DNA analysis. This is not to say that toolmark analysis needs to be as objective as DNA analysis in order to provide value. And, as was the case for friction ridge analysis and in contrast to the case for DNA analysis, the specific features to be examined and compared between toolmarks cannot be stipulated a priori. But the protocols for DNA analysis do represent a precisely specified, and scientifically justified, series of steps that lead to results with well-characterized confidence limits, and that is the goal for all the methods of forensic science.

## ANALYSIS OF HAIR EVIDENCE

The basis for hair analyses as forensic evidence stems from the fact that human and animal hairs routinely are shed and thus are capable of being

---

[65] J.E. Hamby, D.J. Brundage, and J.W. Thorpe. 2009. The identification of bullets fired from 10 consecutively rifled 9mm Ruger pistol barrels—A research project involving 468 participants from 19 countries. Available online at http://www.fti-ibis.com/DOWNLOADS/ Publications/10%20Barrel%20Article-%20a.pdf.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.
Copyright © National Academy of Sciences. All rights reserved.

Case 1:18-cr-00119-SJ    Document 49-1    Filed 07/19/19    Page 10 of 63 PageID #: 662

*156*          STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES

transferred from an individual to the crime scene, and from the crime scene to an individual. Forensic hair examiners generally recognize that various physical characteristics of hairs can be identified and are sufficiently different among individuals that they can be useful in including, or excluding, certain persons from the pool of possible sources of the hair. The results of analyses from hair comparisons typically are accepted as class associations; that is, a conclusion of a "match" means only that the hair could have come from any person whose hair exhibited—within some levels of measurement uncertainties—the same microscopic characteristics, but it cannot uniquely identify one person. However, this information might be sufficiently useful to "narrow the pool" by excluding certain persons as sources of the hair.

Although animal hairs might provide useful evidence in certain cases (e.g., animal poaching), animal hair analysis often can lead to an identification of only the type of animal, not the specific breed[66]; consequently, most (90 to 95 percent) of hair analyses refer to analyses of human hair. Human hairs from different parts of the body have different characteristics; Houck cautions strongly against drawing conclusions about hairs from one part of the body based on analyses of hairs from a different body part.[67]

Houck and Bisbing recommend as minimal training for hair examiners a bachelor's degree in a natural or applied science (e.g., chemistry, biology, forensic science), on-the-job training programs, and an annual proficiency test.[68]

### Sample Data and Collection

Sample hairs received for analysis initially are examined macroscopically for certain broad features such as color, shaft form (e.g., straight, wavy, curved, kinked), length, and overall shaft thickness (e.g., fine, medium, coarse).

In the second stage of analysis, hairs are mounted on microscopic slides using a mounting medium that has the same refractive index (about 1.54) as the hair, to better view the microscopic features (see next section). One hair or multiple hairs from the same source may be mounted on a glass microscope slide with an appropriate cover slip, as long as each mounted hair is clearly visible. It is most important that questioned and known hairs are mounted in the same type of mounting medium.

During this examination, the hair analyst attempts to identify the part of the body from which the hair might have come, based on certain de-

---

[66] P.D. Barnett and R.R. Ogle. 1982. Probabilities and human hair comparison. *Journal of Forensic Sciences* 27(2):272-278.

[67] M.M. Houck and R.E. Bisbing. 2005. Forensic human hair examination and comparison in the 21st century. *Forensic Science Review* 17(1):7.

[68] Ibid., p. 12.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

*FORENSIC SCIENCE DISCIPLINES*                                                  *157*

finable characteristics that distinguish hairs from various body locations. Occasionally, suspects can be eliminated on the basis of these simple microscopic characteristics.

A "control" or "comparison" group of hairs must be collected from a known hair source. A known head hair sample should consist of hairs from the five different areas of the scalp (top, front, back including nape, and both sides). Known hair samples should be obtained by a combination of pulling and combing from the sampled region. Ideally, a total of 50 hairs should be obtained from the scalp. A known pubic hair sample or a sample from any other somatic region should ideally consist of 25 hairs obtained by pulling and combing from different regions. A comparison can still be performed with less than the recommended number of hairs, but this may increase the likelihood of a false exclusion.[69]

Features from human hair analyses can be divided broadly into "major characteristics" and "secondary characteristics." The former category includes features such as color, treatment (e.g., dyed, bleached, curled, permed), pigment aggregation (e.g., streaked, clumped, patchy), and shaft form (e.g., wavy, straight, curly). Other major characteristics may include pigment distribution (e.g., uniform, peripheral, clustered), medulla appearance, if present (e.g., continuous, interrupted, or fragmented—and opaque or translucent), hair diameter, medullary index, and presence or absence of cortical fusi (e.g., root or shaft). Secondary characteristics include cuticular margin (e.g., smooth, serrated, looped, or cracked), pigment density (e.g., absent, sparse, heavy), pigment size (e.g., absent, fine, coarse), tip shape (e.g., tapered, cut, rounded, frayed, split), and shaft diameter (e.g., narrow or wide).[70]

### Studies of Accuracy in Identification

In 1974, investigators Gaudette and Keeping described a system of hair analysis and used it in a study of pairwise comparisons among 861 hairs from 100 different persons.[71] They acknowledged that "the hair samples were not chosen from the population at random, but were selected so that the probability of two hairs being similar would be greater, if anything, than in the population at large."[72] From their assignment of probabilities, the authors estimated that the chance of asserting a difference between two

---

[69] Scientific Working Group on Materials Analysis (SWGMAT). 2005. Forensic human hair examination guidelines. *Forensic Science Communications* 7(2). Available at www.fbi.gov/hq/lab/fsc/backissu/april2005/standards/2005_04_standards02.htm.

[70] Ibid.

[71] B.D. Gaudette and E.S. Keeping. 1974. An attempt at determining probabilities in human scalp hair comparison. *Journal of Forensic Sciences* 19(3):599-606.

[72] Ibid., p. 65.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

*158*          *STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES*

hairs from the same person is small, about 1 in 4,500.[73] This assignment of probabilities has since been shown to be unreliable.[74] Moreover, the study does not confirm the chance of asserting a match between two dissimilar hairs, and the authors acknowledge that, "due to the fact that so many of the characteristics coded are subjective—for example, color, texture—it was not possible to get complete reproducibility between two or more examiners coding the same hair."[75]

Barnett and Ogle raised four concerns with the Gaudette and Keeping study: (1) it relied on idealized (not from real life) test scenarios; (2) there was no objective basis for selecting the features; (3) the statistical analysis of data from the study was questionable; and (4) there was a possible examiner bias.[76] Gaudette attempted to address these concerns through a further study. However, this additional study involved only three hair examiners, in addition to the author. The author concluded that:

> . . . whereas hair is not generally a basis for positive personal identification, the presence of abnormalities or unusual features or the presence of a large number of different unknown hairs all similar to the standard can lead to a more positive conclusion. The problem, at present, lies in finding suitable additional characteristics [of hair, for effecting individualization]. Although there is basic agreement as to the value of the macroscopic and microscopic characteristics used, other characteristics are either unreliable or controversial. Physical characteristics such as refractive index, density, scale counts, tensile strength, and electrical properties have been proposed by some workers but have been attacked by others, and the general consensus is that they are of little use in hair comparison.[77]

In 1990, Wickenheiser and Hepworth attempted a study to address examiner bias in a small study with only two examiners. They reported that "no incorrect associations were made by either examiner."[78] But a study with only two examiners cannot offer accurate and precise estimates of bias in the population of examiners.

An attempt at an objective system for identifying "matches" among hair samples is presented in Verma et al., based on a neural network.[79]

---

[73] A later study on human pubic hairs (Caucasian only) estimated this probability as "about 1 in 800." B.D. Gaudette. 1976. Probabilities and human pubic hair comparisons. *Journal of Forensic Sciences* 21(3):514-517.

[74] P.D. Barnett and R.R. Ogle. 1982. Probabilities and human hair comparison. *Journal of Forensic Sciences* 27(2):272-278.

[75] Gaudette and Keeping, op. cit.

[76] Barnett and Ogle, op. cit.

[77] B.D. Gaudette. 1978. Some further thoughts on probabilities and human hair comparisons. *Journal of Forensic Sciences* 23(4):758-763, pp. 761-762.

[78] Wickenheiser and Hepworth, op. cit., p. 1327.

[79] M.S. Verma, L. Pratt, C. Ganesh, and C. Medina. 2002. Hair-MAP: A prototype automated system for forensic hair comparison and analysis. *Forensic Science International* 129:168-186.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Copyright © National Academy of Sciences. All rights reserved.

Case 1:18-cr-00119-SJ    Document 49-1    Filed 07/19/19    Page 13 of 63 PageID #: 665

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

According to the authors of this article, "The system accurately judged whether two populations of hairs came from the same person or from different persons 83 percent of the time."[80] The article states that 83 percent was obtained by testing the neural network on all possible pairs among 9 samples of hairs from 9 people (i.e., 81 combinations, of which 9 are "true matches" and 72 are "true mismatches"). Their *Table 3*[81] can be summarized as follows:

|                  | System said "same" | System said "different" |          |
| ---------------- | ------------------ | ----------------------- | -------- |
| Same person      | 5                  | 4                       | Total= 9 |
| Different persons | 9                  | 64                      | Total=73 |

Because the total of these 4 numbers is 82, not 81, one presumes a typographical error in the table; as stated, the number of correct calls is $(5 + 64)/81=0.85$, or 85 percent. (If one of the counts, 5 or 64, is off by 1, the percentage would be 84 percent.) However, the table also shows that the neural network claimed 9 of the 73 different pairs as "same," for a false positive rate of $9/73=12$ percent, and 4 sets of hairs from the same person as "different," for a false negative rate of $4/9=44$ percent. With such high error rates, one would want to study improvements to such systems before putting them into routine practice.

Houck et al. indicate that proficiency testing is conducted regularly for hair experts in crime laboratories.[82] Collaborative Testing Services[83] offers hair and fiber proficiency tests annually. Unfortunately, mass production of test samples such as hair is problematic. Because known samples exhibit a range of characteristics within each of the major and secondary characteristics, it is not possible to provide comparable samples to multiple examiners.

### Scientific Interpretation and Reporting of Results

The success of hair analyses to make a positive identification is limited in important ways. Most hair examiners would opine only that hairs exhibiting the same microscopic characteristics "could" have come from a

---

[80] Ibid., p. 179.

[81] Ibid., p. 180.

[82] M.M. Houck, R.E. Bisbing, T.G. Watkins, and R.P. Harman. 2004. Locard exchange: The science of forensic hair comparisons and the admissibility of hair comparison evidence: *Frye* and *Daubert* considered. *Modern Microscopy Journal* Available at www.modernmicroscopy. com/main.asp?article=36&searchkeys=Houck%2BBisbing.

[83] See www.collaborativetesting.com.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Copyright © National Academy of Sciences. All rights reserved.

Case 1:18-cr-00119-SJ    Document 49-1    Filed 07/19/19    Page 14 of 63 PageID #: 666

*160*        *STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES*

particular individual. Moreover, the "best" or most reliable characteristics will vary by case. For example, "color" may be a critical determinant in a case where it is artificial, because that introduces additional independent variables, such as the time since treatment and the actual hair color, while a natural hair might provide less information.

However, several members of the committee have experienced courtroom cases in which, despite the lack of a statistical foundation, microscopic hair examiners have made probabilistic claims based on their experience, as occurred in some DNA exoneration cases in which microscopic hair analysis evidence had been introduced during trial. Aitken and Robertson discuss some probabilistic concepts with respect to hair analysis.[84]

The availability of DNA analysis has lessened the reliance on hair examination. In a very high proportion of cases involving hair evidence, DNA can be extracted, even years after the crime has been committed. Although the DNA extraction may consist of only mitochondrial DNA (mtDNA), such analyses are likely to be much more specific than those conducted on the physical features of hair. For this reason, cases that might have relied heavily on hair examinations have been subjected more recently to additional analyses using DNA.[85] Because of the inherent limitations of hair comparisons and the availability of higher-quality and higher-accuracy analyses based on mtDNA, traditional hair examinations may be presented less often as evidence in the future, although microscopic comparison of physical features will continue to be useful for determining which hairs are sufficiently similar to merit comparisons with DNA analysis and for excluding suspects and assisting in criminal investigations.

### Summary Assessment

No scientifically accepted statistics exist about the frequency with which particular characteristics of hair are distributed in the population. There appear to be no uniform standards on the number of features on which hairs must agree before an examiner may declare a "match." In one study of validity and accuracy of the technique, the authors required exact agreement on seven "major" characteristics and at least two agreements among six "secondary" characteristics.[86] The categorization of hair features depends heavily on examiner proficiency and practical experience.

An FBI study found that, of 80 hair comparisons that were "associ-

---

[84] C.G.G. Aitken and J.A. Robertson. 1986. A contribution to the discussion of probabilities and human hair comparisons. *Journal of Forensic Sciences* 32(3):684-689.

[85] M.M. Houck and B. Budowle. 2002. Correlation of microscopic and mitochondrial DNA hair comparisons. *Journal of Forensic Sciences* 47(5):964-967.

[86] R.A. Wickenheiser and D.G. Hepworth. 1990. Further evaluation of probabilities in human hair comparisons. *Journal of Forensic Sciences* 35(6):1323-1329.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Copyright © National Academy of Sciences. All rights reserved.

Case 1:18-cr-00119-SJ    Document 49-1    Filed 07/19/19    Page 15 of 63 PageID #: 667

Strengthening Forensic Science in the United States: A Path Forward
http://www.nap.edu/catalog/12589.html

ated" through microscopic examinations, 9 of them (12.5 percent) were found in fact to come from different sources when reexamined through mtDNA analysis.[87] This illustrates not only the imprecision of microscopic hair analyses, but also the problem with using imprecise reporting terminology such as "associated with," which is not clearly defined and which can be misunderstood to imply individualization.

In some recent cases, courts have explicitly stated that microscopic hair analysis is a technique generally accepted in the scientific community.[88] But courts also have recognized that testimony linking microscopic hair analysis with particular defendants is highly unreliable.[89] In cases where there seems to be a morphological match (based on microscopic examination), it must be confirmed using mtDNA analysis; microscopic studies alone are of limited probative value. The committee found no scientific support for the use of hair comparisons for individualization in the absence of nuclear DNA. Microscopy and mtDNA analysis can be used in tandem and may add to one another's value for classifying a common source, but no studies have been performed specifically to quantify the reliability of their joint use.

## ANALYSIS OF FIBER EVIDENCE

Fibers associated with a crime—including synthetic fibers such as nylon, polyester and acrylic as well as botanical fibers such as ramie or jute, which are common in ropes or twines—can be examined microscopically in the same way as hairs, and with the same limitations. However, fibers also can be analyzed using the tools of analytical chemistry, which provide a more solid scientific footing than that underlying morphological examination. In some cases, clothing and carpets have been subjected to relatively distinctive environmental conditions (e.g., sunlight exposure or laundering agents) that impart characteristics that can distinguish particular items from others from the same manufacturing lot. Fiber examiners agree, however, that none of these characteristics is suitable for individualizing fibers (associating a fiber from a crime scene with one, and only one, source) and that fiber evidence can be used only to associate a given fiber with a class of fibers.[90]

---

[87] Houck and Budowle, op. cit.

[88] E.g., *State v. West*, 877 A.2d 787 (Conn. 2005); *Bookins v. State*, 922 A.2d 389 (Del. Supr, 2007).

[89] See P.C. Giannelli and E. West. 2001. Hair comparison evidence. *Criminal Law Bulletin* 37:514.

[90] See, e.g., R.R. Bresee. 1987. Evaluation of textile fiber evidence: A review. *Journal of Forensic Sciences* 32(2):510-521. See also SWGMAT. 1999. Introduction to forensic fiber examination. *Forensic Science Communications* 1(1). Available at www.fbi.gov/hq/lab/fsc/backissu/april1999/houcktoc.htm, which includes the following summarization in Section 5.4: "It can never be stated with certainty that a fiber originated from a particular textile because

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.
Copyright © National Academy of Sciences. All rights reserved.

# Exhibit C



# REPORT TO THE PRESIDENT
# Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods

Executive Office of the President
President's Council of Advisors on
Science and Technology

September 2016





# REPORT TO THE PRESIDENT
# Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods

Executive Office of the President
President's Council of Advisors on
Science and Technology

September 2016



# About the President's Council of Advisors on Science and Technology

The President's Council of Advisors on Science and Technology (PCAST) is an advisory group of the Nation's leading scientists and engineers, appointed by the President to augment the science and technology advice available to him from inside the White House and from cabinet departments and other Federal agencies. PCAST is consulted about, and often makes policy recommendations concerning, the full range of issues where understandings from the domains of science, technology, and innovation bear potentially on the policy choices before the President.

For more information about PCAST, see www.whitehouse.gov/ostp/pcast.



# The President's Council of Advisors on Science and Technology

## Co-Chairs

**John P. Holdren**
Assistant to the President for
Science and Technology
Director, Office of Science and Technology
Policy

**Eric S. Lander**
President
Broad Institute of Harvard and MIT

## Vice Chairs

**William Press**
Raymer Professor in Computer Science and
Integrative Biology
University of Texas at Austin

**Maxine Savitz**
Honeywell (ret.)

## Members

**Wanda M. Austin**
President and CEO
The Aerospace Corporation

**Christopher Chyba**
Professor, Astrophysical Sciences and
International Affairs
Princeton University

**Rosina Bierbaum**
Professor, School of Natural Resources and
Environment, University of Michigan
Roy F. Westin Chair in Natural Economics,
School of Public Policy, University of
Maryland

**S. James Gates, Jr.**
John S. Toll Professor of Physics
Director, Center for String and
Particle Theory
University of Maryland, College Park

**Christine Cassel**
Planning Dean
Kaiser Permanente School of Medicine

**Mark Gorenberg**
Managing Member
Zetta Venture Partners



v

**Susan L. Graham**
Pehong Chen Distinguished Professor Emerita
    in Electrical Engineering and Computer
    Science
University of California, Berkeley

**Ed Penhoet**
Director
Alta Partners
Professor Emeritus, Biochemistry and Public
    Health
University of California, Berkeley

**Michael McQuade**
Senior Vice President for Science and
    Technology
United Technologies Corporation

**Barbara Schaal**
Dean of the Faculty of Arts and Sciences
Mary-Dell Chilton Distinguished Professor of
    Biology
Washington University of St. Louis

**Chad Mirkin**
George B. Rathmann Professor of
    Chemistry
Director, International Institute for
    Nanotechnology
Northwestern University

**Eric Schmidt**
Executive Chairman
Alphabet, Inc.

**Mario Molina**
Distinguished Professor, Chemistry and
    Biochemistry
University of California, San Diego
Professor, Center for Atmospheric Sciences
Scripps Institution of Oceanography

**Daniel Schrag**
Sturgis Hooper Professor of Geology
Professor, Environmental Science and
    Engineering
Director, Harvard University Center for
    Environment
Harvard University

**Craig Mundie**
President
Mundie Associates

## Staff

**Ashley Predith**
Executive Director

**Diana E. Pankevich**
AAAS Science & Technology Policy Fellow

**Jennifer L. Michael**
Program Support Specialist

 vi



# PCAST Working Group

Working Group members participated in the preparation of this report.  The full membership of PCAST reviewed and approved it.

## Working Group

**Eric S. Lander** (Working Group Chair)
President
Broad Institute of Harvard and MIT

**Michael McQuade**
Senior Vice President for Science and
  Technology
United Technologies Corporation

**S. James Gates, Jr.**
John S. Toll Professor of Physics
Director, Center for String and
  Particle Theory
University of Maryland, College Park

**William Press**
Raymer Professor in Computer Science and
  Integrative Biology
University of Texas at Austin

**Susan L. Graham**
Pehong Chen Distinguished Professor Emerita
  in Electrical Engineering and Computer
  Science
University of California, Berkeley

**Daniel Schrag**
Sturgis Hooper Professor of Geology
Professor, Environmental Science and
  Engineering
Director, Harvard University Center for
  Environment
Harvard University

## Staff

**Diana E. Pankevich**
AAAS Science & Technology Policy Fellow

**Kristen Zarrelli**
Advisor, Public Policy & Special Projects
Broad Institute of Harvard and MIT

## Writer

**Tania Simoncelli**
Senior Advisor to the Director
Broad Institute of Harvard and MIT



# Senior Advisors

PCAST consulted with a panel of legal experts to provide guidance on factual matters relating to the interaction between science and the law. PCAST also sought guidance and input from two statisticians, who have expertise in this domain. Senior advisors were given an opportunity to review early drafts to ensure factual accuracy. PCAST expresses its gratitude to those listed here. Their willingness to engage with PCAST on specific points does not imply endorsement of the views expressed in this report. Responsibility for the opinions, findings, and recommendations in this report and for any errors of fact or interpretation rests solely with PCAST.

## Senior Advisor Co-Chairs

**The Honorable Harry T. Edwards**
Judge
United States Court of Appeals
District of Columbia Circuit

**Jennifer L. Mnookin**
Dean, David G. Price and Dallas P. Price
  Professor of Law
University of California Los Angeles Law

## Senior Advisors

**The Honorable James E. Boasberg**
District Judge
United States District Court
District of Columbia

**The Honorable Pamela Harris**
Judge
United States Court of Appeals
Fourth Circuit

**The Honorable Andre M. Davis**
Senior Judge
United States Court of Appeals
Fourth Circuit

**Karen Kafadar**
Commonwealth Professor and Chair
Department of Statistics
University of Virginia

**David L. Faigman**
Acting Chancellor & Dean
University of California Hastings College of
  the Law

**The Honorable Alex Kozinski**
Judge
United States Court of Appeals
Ninth Circuit

**Stephen Fienberg**
Maurice Falk University Professor of Statistics
  and Social Science (Emeritus)
Carnegie Mellon University

**The Honorable Cornelia T.L. Pillard**
Judge
United States Court of Appeals
District of Columbia Circuit



**The Honorable Charles Fried**
Beneficial Professor of Law
Harvard Law School
Harvard University

**The Honorable Nancy Gertner**
Senior Lecturer on Law
Harvard Law School
Harvard University

**The Honorable Jed S. Rakoff**
District Judge
United States District Court
Southern District of New York

**The Honorable Patti B. Saris**
Chief Judge
United States District Court
District of Massachusetts

EXECUTIVE OFFICE OF THE PRESIDENT
**PRESIDENT'S COUNCIL OF ADVISORS ON SCIENCE AND TECHNOLOGY**
WASHINGTON, D.C. 20502

President Barack Obama
The White House
Washington, DC 20502

Dear Mr. President:

We are pleased to send you this PCAST report on *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods*.  The study that led to the report was a response to your question to PCAST, in 2015, as to whether there are additional steps on the scientific side, beyond those already taken by the Administration in the aftermath of the highly critical 2009 National Research Council report on the state of the forensic sciences, that could help ensure the validity of forensic evidence used in the Nation's legal system.

PCAST concluded that there are two important gaps: (1) the need for clarity about the scientific standards for the validity and reliability of forensic methods and (2) the need to evaluate specific forensic methods to determine whether they have been scientifically established to be valid and reliable.  Our study aimed to help close these gaps for a number of forensic "feature-comparison" methods—specifically, methods for comparing DNA samples, bitemarks, latent fingerprints, firearm marks, footwear, and hair.

Our study, which included an extensive literature review, was also informed by inputs from forensic researchers at the Federal Bureau of Investigation Laboratory and the National Institute of Standards and Technology as well as from many other forensic scientists and practitioners, judges, prosecutors, defense attorneys, academic researchers, criminal-justice-reform advocates, and representatives of Federal agencies. The findings and recommendations conveyed in this report, of course, are PCAST's alone.

Our report reviews previous studies relating to forensic practice and Federal actions currently underway to strengthen forensic science; discusses the role of scientific validity within the legal system; explains the criteria by which the scientific validity of feature-comparison forensic methods can be judged; and applies those criteria to the selected feature-comparison methods.

★   x   ★

Based on our findings concerning the "foundational validity" of the indicated methods as well as their "validity as applied" in practice in the courts, we offer recommendations on actions that could be taken by the National Institute of Standards and Technology, the Office of Science and Technology Policy, and the Federal Bureau of Investigation Laboratory to strengthen the scientific underpinnings of the forensic disciplines, as well as on actions that could be taken by the Attorney General and the judiciary to promote the more rigorous use of these disciplines in the courtroom.

Sincerely,

John P. Holdren
Co-Chair

Eric S. Lander
Co-Chair



# Table of Contents

The President's Council of Advisors on Science and Technology .....................................................v

PCAST Working Group ...........................................................................................................vii

Senior Advisors ...................................................................................................................viii

Table of Contents...............................................................................................................xii

**Executive Summary** ............................................................................................................ 1

**1. Introduction**.................................................................................................................. 21

**2. Previous Work on Validity of Forensic-Science Methods** ................................................. 25

    2.1   DNA Evidence and Wrongful Convictions....................................................................25

    2.2   Studies of Specific Forensic-Science Methods and Laboratory Practices..............................27

    2.3   Testimony Concerning Forensic Evidence ....................................................................29

    2.4   Cognitive Bias...........................................................................................................31

    2.5   State of Forensic Science ...........................................................................................32

    2.6   State of Forensic Practice ...........................................................................................33

    2.7   National Research Council Report ...............................................................................34

    2.8   Recent Progress ......................................................................................................35

**3. The Role of Scientific Validity in the Courts**................................................................... 40

    3.1   Evolution of Admissibility Standards ..........................................................................40

    3.2   Foundational Validity and Validity as Applied ..............................................................42

**4. Scientific Criteria for Validity and Reliability of Forensic Feature-Comparison Methods**.... 44

    4.1   Feature-Comparison Methods: Objective and Subjective Methods .....................................46

    4.2   Foundational Validity: Requirement for Empirical Studies................................................47

    4.3   Foundational Validity: Requirement for Scientifically Valid Testimony ...............................54

    4.4   Neither Experience nor Professional Practices Can Substitute for Foundational Validity .......55

    4.5   Validity as Applied: Key Elements................................................................................56

    4.6   Validity as Applied: Proficiency Testing .......................................................................57

    4.7   Non-Empirical Views in the Forensic Community...........................................................59

    4.8   Empirical Views in the Forensic Community...................................................................63

    4.9   Summary of Scientific Findings ..................................................................................65

**5. Evaluation of Scientific Validity for Seven Feature-Comparison Methods** ......................... 67

    5.1   DNA Analysis of Single-source and Simple-mixture samples............................................69

    5.2   DNA Analysis of Complex-mixture Samples..................................................................75

    5.3   Bitemark Analysis.....................................................................................................83

    5.4   Latent Fingerprint Analysis ......................................................................................87

    5.5   Firearms Analysis ...................................................................................................104

    5.6   Footwear Analysis: Identifying Characteristics.............................................................114

    5.7   Hair Analysis..........................................................................................................118

    5.8   Application to Additional Methods.............................................................................122

    5.9   Conclusion............................................................................................................122

**6. Recommendations to NIST and OSTP** ......................................................................... **124**

    6.1   Role for NIST in Ongoing Evaluation of Foundational Validity ............................... 124

    6.2   Accelerating the Development of Objective Methods .......................................... 125

    6.3   Improving the Organization for Scientific Area Committees ................................. 126

    6.4   Need for an R&D Strategy for Forensic Science .................................................... 127

    6.5   Recommendations ............................................................................................... 128

**7. Recommendations to the FBI Laboratory** ..................................................................... **131**

    7.1   Role for FBI Laboratory ........................................................................................ 131

    7.2   Recommendations ............................................................................................... 134

**8. Recommendations to the Attorney General** ................................................................ **136**

    8.1   Ensuring the Use of Scientifically Valid Methods in Prosecutions ....................... 136

    8.2   Revision of DOJ Recently Proposed Guidelines on Expert Testimony ................... 136

    8.3   Recommendations ............................................................................................... 140

**9. Recommendations to the Judiciary** .............................................................................. **142**

    9.1   Scientific Validity as a Foundation for Expert Testimony .................................... 142

    9.2   Role of Past Precedent ......................................................................................... 143

    9.3   Resources for Judges ........................................................................................... 144

    9.4   Recommendations ............................................................................................... 145

**10. Scientific Findings** ..................................................................................................... **146**

**Appendix A: Statistical Issues** ........................................................................................ **151**

    Sensitivity and False Positive Rate ............................................................................... 151

    Confidence Intervals .................................................................................................... 152

    Calculating Results for Conclusive Tests ...................................................................... 153

    Bayesian Analysis ........................................................................................................ 153

**Appendix B. Additional Experts Providing Input** ............................................................ **155**

★ xiii ★

DEFENDANT'S
EXHIBIT

fingerprint analysis possible in the near future. There have already been initial steps in this direction, both in academia and industry.

The most important resource to propel the development of objective methods would be the creation of huge databases containing known prints, each with many corresponding "simulated" latent prints of varying qualities and completeness, which would be made available to scientifically-trained researchers in academia and industry. The simulated latent prints could be created by "morphing" the known prints, based on transformations derived from collections of actual latent print-record print pairs.

### *Firearms Analysis*

In firearms analysis, examiners attempt to determine whether ammunition is or is not associated with a specific firearm based on "toolmarks" produced by guns on the ammunition. The discipline is based on the idea that the toolmarks produced by different firearms vary substantially enough (owing to variations in manufacture and use) to allow components of fired cartridges to be identified with particular firearms. For example, examiners may compare "questioned" cartridge cases from a gun recovered from a crime scene to test fires from a suspect gun. Examination begins with an evaluation of class characteristics of the bullets and casings, which are features that are permanent and predetermined before manufacture. If these class characteristics are different, an elimination conclusion is rendered. If the class characteristics are similar, the examination proceeds to identify and compare individual characteristics, such as the markings that arise during firing from a particular gun.

Firearms analysts have long stated that their discipline has near-perfect accuracy; however, the 2009 National Research Council study of all the forensic disciplines concluded about firearms analysis that "sufficient studies have not been done to understand the reliability and reproducibility of the methods"—that is, that the foundational validity of the field had not been established.

Our own extensive review of the relevant literature prior to 2009 is consistent with the National Research Council's conclusion. We find that many of these earlier studies were inappropriately designed to assess foundational validity and estimate reliability. Indeed, there is internal evidence among the studies themselves indicating that many previous studies underestimated the false positive rate by at least 100-fold.

We identified one notable advance since 2009: the completion of the first appropriately designed black-box study of firearms. The work was commissioned and funded by the Defense Department's Forensic Science Center and was conducted by an independent testing lab (the Ames Laboratory, a Department of Energy national laboratory affiliated with Iowa State University). The false-positive rate was estimated at 1 in 66, with a confidence bound indicating that the rate could be as high as 1 in 46. While the study is available as a report to the Federal government, it has not been published in a scientific journal.

The scientific criteria for foundational validity require that there be more than one such study, to demonstrate reproducibility, and that studies should ideally be published in the peer-reviewed scientific literature. Accordingly, the current evidence still falls short of the scientific criteria for foundational validity.

Whether firearms analysis should be deemed admissible based on current evidence is a decision that belongs to the courts. If firearms analysis *is* allowed in court, the scientific criteria for validity as applied should be understood to require clearly reporting the error rates seen in the one appropriately designed black-box study. Claims of higher accuracy are not scientifically justified at present.

Validity as applied would also require, from a scientific standpoint, that an expert testifying on firearms analysis (1) has undergone rigorous proficiency testing on a large number of test problems to measure his or her accuracy and discloses the results of the proficiency testing and (2) discloses whether, when performing the examination, he or she was aware of any other facts of the case that might influence the conclusion.

Concerning the path forward, with firearms analysis as with latent fingerprint analysis, two directions are available for strengthening the scientific underpinnings of the discipline. The first is to improve firearms analysis as a subjective method, which would require additional black-box studies to assess scientific validity and reliability and more rigorous proficiency testing of examiners, using problems that are appropriately challenging and publically disclosed after the test.

The second direction, as with latent print analysis, is to convert firearms analysis from a subjective method to an objective method. This would involve developing and testing image-analysis algorithms for comparing the similarity of tool marks on bullets. There have already been encouraging steps toward this goal. The same tremendous progress over the past decade in image analysis that gives us reason to expect early achievement of fully automated latent print analysis is cause for optimism that fully automated firearms analysis may be possible in the near future. Efforts in this direction are currently hampered, however, by lack of access to realistically large and complex databases that can be used to continue development of these methods and validate initial proposals.

NIST, in coordination with the FBI Laboratory, should play a leadership role in propelling the needed transformation by creating and disseminating appropriate large datasets. These agencies should also provide grants and contracts to support work—and systematic processes to evaluate methods. In particular, we believe that "prize" competitions—based on large, publicly available collections of images—could attract significant interest from academia and industry.

### *Footwear Analysis*

Footwear analysis is a process that typically involves comparing a known object, such as a shoe, to a complete or partial impression found at a crime scene, to assess whether the object is likely to be the source of the impression. The process proceeds in a stepwise manner, beginning with a comparison of "class characteristics" (such as design, physical size, and general wear) and then moving to "identifying characteristics" or "randomly acquired characteristics" (such as marks on a shoe caused by cuts, nicks, and gouges in the course of use).

PCAST has not addressed the question of whether examiners can reliably determine class characteristics—for example, whether a particular shoeprint was made by a size 12 shoe of a particular make. While it is important that studies be undertaken to estimate the reliability of footwear analysis aimed at determining class characteristics, PCAST chose not to focus on this aspect of footwear examination because it is not *inherently* a

DEFENDANT'S
EXHIBIT

orchestrate on a large scale.[138]  On the other hand, test-blind proficiency tests have been used for DNA analysis,[139] and select labs have begun to implement this type of testing, in-house, as part of their quality assurance programs.[140]  We note that test-blind proficiency testing is much easier to adopt in laboratories that have adopted "context management procedures" to reduce contextual bias.[141]

PCAST believes that test-blind proficiency testing of forensic examiners should be vigorously pursued, with the expectation that it should be in wide use, at least in large laboratories, within the next five years.  However, PCAST believes that it is not yet realistic to require test-blind proficiency testing because the procedures for test-blind proficiency tests have not yet been designed and evaluated.

While only non-test-blind proficiency tests are used to support validity as applied, it is scientifically important to report this limitation, including to juries—because, as noted above, non-blind proficiency tests are likely to overestimate the accuracy because the examiners knew they were being tested.

## 4.7 Non-Empirical Views in the Forensic Community

While the scientific validity of metrological methods requires empirical demonstration of accuracy, there have historically been efforts in the forensic community to justify non-empirical approaches.  This is of particular concern because such views are sometimes mistakenly codified in policies or practices.  These heterodox views typically involve four recurrent themes, which we review below.

### "Theories" of Identification

A common argument is that forensic practices should be regarded as valid because they rest on scientific "theories" akin to the fundamental laws of physics, that should be accepted because they have been tested and not "falsified."[142]

An example is the "Theory of Identification as it Relates to Toolmarks," issued in 2011 by the Association of Firearm and Tool Mark Examiners.[143,144]  It states in its entirety:

---

[138] Some of the challenges associated with designing blind inter-laboratory proficiency tests may be addressed if the forensic laboratories were to move toward a system where an examiner's knowledge of a case were limited to domain-relevant information.

[139] See: Peterson, J.L., Lin, G., Ho, M., Chen, Y., and R.E. Gaensslen. "The feasibility of external blind DNA proficiency testing. II. Experience with actual blind tests." *Journal of Forensic Science,* Vol. 48, No. 1 (2003): 32-40.

[140] For example, the Houston Forensic Science Center has implemented routine, blind proficiency testing for its firearms examiners and chemistry analysis unit, and is planning to carry out similar testing for its DNA and latent print examiners.

[141] For background, see www.justice.gov/ncfs/file/888586/download.

[142] See: www.swggun.org/index.php?option=com_content&view=article&id=66:the-foundations-of-firearm-and-toolmark-identification&catid=13:other&Itemid=43 and www.justice.gov/ncfs/file/888586/download.

[143] Association of Firearm and Tool Mark Examiners. "Theory of Identification as it Relates to Tool Marks: Revised." *AFTE Journal*, Vol. 43, No. 4 (2011): 287.

[144] Firearms analysis is considered in detail in Chapter 5.

*1. The theory of identification as it pertains to the comparison of toolmarks enables opinions of common origin to be made when the unique surface of two toolmarks are in "sufficient agreement."*

*2. This "sufficient agreement" is related to the significant duplication of random toolmarks as evidenced by the correspondence of a pattern or combination of patterns of surface contours. Significance is determined by the comparative examination of two or more sets of surface contour patterns comprised of individual peaks, ridges and furrows. Specifically, the relative height or depth, width, curvature and spatial relationship of the individual peaks, ridges and furrows within one set of surface contours are defined and compare to the corresponding features in the second set of surface contours. Agreement is significant when the agreement in individual characteristics exceeds the best agreement demonstrated between toolmarks known to have been produced by different tools and is consistent with agreement demonstrated by toolmarks known to have been produced by the same tool. The statement that "sufficient agreement" exists between two toolmarks means that the agreement of individual characteristics is of a quantity and quality that the likelihood another tool could have made the mark is so remote as to be considered a practical impossibility.*

*3. Currently the interpretation of individualization/identification is subjective in nature, founded on scientific principles and based on the examiner's training and experience.*

The statement is clearly not a scientific theory, which the National Academy of Sciences has defined as "a comprehensive explanation of some aspect of nature that is supported by a vast body of evidence."[145] Rather, it is a claim that examiners applying a subjective approach can accurately individualize the origin of a toolmark. Moreover, a "theory" is not what is needed. What is needed are empirical tests to see how well the method performs.

More importantly, the stated method is circular. It declares that an examiner may state that two toolmarks have a "common origin" when their features are in "sufficient agreement." It then defines "sufficient agreement" as occurring when the examiner considers it a "practical impossibility" that the toolmarks have different origins. (In response to PCAST's concern about this circularity, the FBI Laboratory replied that: "'Practical impossibility' is the certitude that exists when there is sufficient agreement in the quality and quantity of individual characteristics."[146] This answer did not resolve the circularity.)

## Focus on 'Training and Experience' Rather Than Empirical Demonstration of Accuracy

Many practitioners hold an honest belief that they are able to make accurate judgments about identification based on their training and experience. This notion is explicit in the AFTE's *Theory of Identification*, which notes that interpretation is subjective in nature, "based on an examiner's training and experience." Similarly, the leading textbook on footwear analysis states,

*Positive identifications may be made with as few as one random identifying characteristic, but only if that characteristic is confirmable; has sufficient definition, clarity, and features; is in the same location and*

---

[145] See: www.nas.edu/evolution/TheoryOrFact.html.
[146] Communication from FBI Laboratory to PCAST (June 6, 2016).

> orientation on the shoe outsole; and <u>in the opinion of an experienced examiner, would not occur again on another shoe.</u>[147] [emphasis added]

In effect, it says, positive identification depends on the examiner being *positive* about the identification.

"Experience" is an inadequate foundation for drawing judgments about whether two sets of features could have been produced by (or found on) different sources. Even if examiners could recall in sufficient detail all the patterns or sets of features that they have seen, they would have no way of knowing accurately in which cases two patterns actually came from different sources, because the correct answers are rarely known in casework.

The fallacy of relying on "experience" was evident in testimony by a former head of the FBI's fingerprint unit (discussed above) that the FBI had "an error rate of one per every 11 million cases," based on the fact that the agency was only aware of one mistake.[148]  By contrast, recent empirical studies by the FBI Laboratory (discussed in Chapter 5) indicate error rates of roughly one in several hundred.

"Training" is an even weaker foundation.  The mere fact that an individual has been trained in a method does not mean that the method itself is scientifically valid nor that the individual is capable of producing reliable answers when applying the method.

### Focus on 'Uniqueness' Rather Than Accuracy

Many forensic feature-comparison disciplines are based on the premise that various sets of features (for example, fingerprints, toolmarks on bullets, human dentition, and so on) are "unique."[149]

---

[147] Bodziak, W. J. *Footwear Impression Evidence: Detection, Recovery, and Examination*. 2nd ed. CRC Press-Taylor & Francis, Boca Raton, Florida (2000).

[148] *U.S. v. Baines* 573 F.3d 979 (2009) at 984.

[149] For fingerprints, see, for example: Wertheim, Kasey. "Letter re: ACE-V: Is it scientifically reliable and accurate?" *Journal of Forensic Identification*, Vol. 52 (2002): 669 ("The law of biological uniqueness states that exact replication of any given organism cannot occur (nature never repeats itself), and, therefore, no biological entity will ever be exactly the same as another") and Budowle, B., Buscaglia, J., and R.S. Perlman. "Review of the scientific basis for friction ridge comparisons as a means of identification: committee findings and recommendations." *Forensic Science Communications*, Vol. 8 (2006) ("The use of friction ridge skin comparisons as a means of identification is based on the assumptions that the pattern of friction ridge skin is both unique and permanent").  For firearms, see, for example, Riva, F., and C. Christope. "Automatic comparison and evaluation of impressions left by a firearm on fired cartridge cases." *Journal of Forensic Sciences*, Vol. 59, (2014): 637 ("The ability to identify a firearm as the source of a questioned cartridge case or bullet is based on two tenets constituting the scientific foundation of the discipline.  The first assumes the uniqueness of impressions left by the firearms") and SWGGUN Admissibility Resource Kit (ARK): Foundational Overview of Firearm/Toolmark Identification. available at: afte.org/resources/swggun-ark ("The basis for identification in Toolmark Identification is founded on the principle of uniqueness . . . wherein, all objects are unique to themselves and thus can be differentiated from one another").  For bitemarks, see, for example, Kieser, J.A., Bernal, V., Neil Waddell, J., and S. Raju. "The uniqueness of the human anterior dentition: a geometric morphometric analysis." *Journal of Forensic Sciences,* Vol. 52 (2007): 671-7 ("There are two postulates that underlie all bitemark analyses: first, that the characteristics of the anterior teeth involved in the bite are unique, and secondly, that this uniqueness is accurately recorded in the material bitten.") and Pretty, I.A. "Resolving Issues in Bitemark Analysis" in *Bitemark Evidence: A Color Atlas* R.B.J Dorian, Ed. CRC Press. Chicago (2011) ("Bitemark

The forensics science literature contains many "uniqueness" studies that go to great lengths to try to establish the correctness of this premise.[150]  For example, a 2012 paper studied 39 Adidas Supernova Classic running shoes (size 12) worn by a single runner over 8 years, during which time he kept a running journal and ran over the same types of surfaces. [151]  After applying black shoe polish to the soles of the shoes, the author asked the runner to carefully produce tread marks on sheets of legal paper on a hardwood floor.  The author showed that it was possible to identify small identifying differences between the tread marks produced by different pairs of shoes.

Yet, uniqueness studies miss the fundamental point.  The issue is not whether *objects* or *features* differ; they surely do if one looks at a fine enough level.  The issue is how well and under what circumstances *examiners* applying a given metrological method can reliably *detect* relevant differences in features to reliably identify whether they share a common source.  Uniqueness studies, which focus on the properties of features themselves, can therefore never establish whether a particular *method* for measuring and comparing features is foundationally valid.  Only empirical studies can do so.

Moreover, it is not *necessary* for features to be unique in order for them to be useful in narrowing down the source of a feature.  Rather, it is essential that there be empirical evidence about how often a method incorrectly attributes the source of a feature.

### Decoupling Conclusions about Identification from Estimates of Accuracy

Finally, some hold the view that, when the application of a scientific method leads to a conclusion of an association or proposed identification, it is *unnecessary* to report in court the reliability of the method.[152]  As a rationale, it is sometimes argued that it is impossible to measure error rates perfectly or that it is impossible to know the error rate in the *specific* case at hand.

This notion is contrary to the fundamental principle of scientific validity in metrology—namely, that the claim that two objects have been compared and found to have the same property (length, weight, or fingerprint pattern) is meaningless without quantitative information about the reliability of the comparison process.

It is standard practice to study and report error rates in medicine—both to establish the reliability of a method in principle and to assess its implementation in practice.  No one argues that measuring or reporting clinical error rates is inappropriate because they might not perfectly reflect the situation for a *specific* patient.  If

---

analysis is based on two postulates: (a) the dental characteristics of anterior teeth involved in biting are unique among individuals, and (b) this asserted uniqueness is transferred and recorded in the injury.").

[150] Some authors have criticized attempts to affirm the uniqueness proposition based on observations, noting that they rest on pure inductive reasoning, a method for scientific investigation that "fell out of favour during the epoch of Sir Francis Bacon in the 16th century."  Page, M., Taylor, J., and M. Blenkin. "Uniqueness in the forensic identification sciences—fact or fiction?" *Forensic Science International*, Vol. 206 (2011): 12-8.

[151] Wilson, H.D. "Comparison of the individual characteristics in the outsoles of thirty-nine pairs of Adidas Supernova Classic shoes." *Journal of Forensic Identification*, Vol. 62, No. 3 (2012): 194-204.

[152] See: www.justice.gov/olp/file/861936/download.

transparency about error rates is appropriate for matching blood types before a transfusion, it is appropriate for matching forensic samples—where errors may have similar life-threatening consequences.

We return to this topic in Chapter 8, where we observe that the DOJ's recent proposed guidelines on expert testimony are based, in part, on this scientifically inappropriate view.

## 4.8 Empirical Views in the Forensic Community

Although some in the forensic community continue to hold views such as those described in the previous section, a growing segment of the forensic science community has responded to the 2009 NRC report with an increased recognition of the need for empirical studies and with initial efforts to undertake them.  Examples include published research studies by forensic scientists, assessments of research needs by Scientific Working Groups  and OSAC committees, and statements from the NCFS.

Below we highlight several examples from recent papers by forensic scientists:

- *Researchers at the National Academy of Sciences and elsewhere (e.g., Saks & Koehler, 2005; Spinney, 2010) have argued that there is an urgent need to develop objective measures of accuracy in fingerprint identification. Here we present such data.*[153]

- *Tool mark impression evidence, for example, has been successfully used in courts for decades, but its examination has lacked scientific, statistical proof that would independently corroborate conclusions based on morphology characteristics (2–7).  In our study, we will apply methods of statistical pattern recognition (i.e., machine learning) to the analysis of toolmark impressions.*[154]

- *The NAS report calls for further research in the area of bitemarks to demonstrate that there is a level of probative value and possibly restricting the use of analyses to the exclusion of individuals.  This call to respond must be heard if bite-mark evidence is to be defensible as we move forward as a discipline.*[155]

- *The National Research Council of the National Academies and the legal and forensic sciences communities have called for research to measure the accuracy and reliability of latent print examiners' decisions, a challenging and complex problem in need of systematic analysis.  Our research is focused on the development of empirical approaches to studying this problem.*[156]

---

[153] Tangen, J.M., Thompson, M.B., and D.J. McCarthy. "Identifying fingerprint expertise." *Psychological Science*, Vol. 22, No. 8 (2011): 995-7.

[154] Petraco, N.D., Shenkin, P., Speir, J., Diaczuk, P., Pizzola, P.A., Gambino, C., and N. Petraco. "Addressing the National Academy of Sciences' Challenge: A Method for Statistical Pattern Comparison of Striated Tool Marks." *Journal of Forensic Sciences*, Vol. 57 (2012): 900-11.

[155] Pretty, I.A., and D. Sweet. "A paradigm shift in the analysis of bitemarks." *Forensic Science International*, Vol. 201 (2010): 38-44.

[156] Ulery, B.T., Hicklin, R.A., Buscaglia, J., and M.A., Roberts. "Accuracy and reliability of forensic latent fingerprint decisions." *PNAS*, Vol. 108, No. 19 (2011): 7733-8.

- *We believe this report should encourage the legal community to require that the emerging field of forensic neuroimaging, including fMRI based lie detection, have a proper scientific foundation before being admitted in courts.[157]*

- *An empirical solution which treats the system [referring to voiceprints] as a black box and its output as point values is therefore preferred.[158]*

Similarly, the OSAC and other groups have acknowledged critical research gaps in the evidence supporting various forensic science disciplines and have begun to develop plans to close some of these gaps.  We highlight several examples below:

- *While validation studies of firearms and toolmark analysis schemes have been conducted, most have been relatively small data sets.  If a large study were well designed and has sufficient participation, it is our anticipation that similar lessons could be learned for the firearms and toolmark discipline.[159]*

- *We are unaware of any study that assesses the overall firearm and toolmark discipline's ability to correctly/consistently categorize evidence by class characteristics, identify subclass marks, and eliminate items using individual characteristics.[160]*

- *Currently there is not a reliable assessment of the discriminating strength of specific friction ridge feature types.[161]*

- *To date there is little scientific data that quantifies the overall risk of close non-matches in AFIS databases.  It is difficult to create standards regarding sufficiency for examination or AFIS search searching without this type of research.[162]*

---

[157] Langleben, D.D., and J.C. Moriarty. "Using brain imaging for lie detection: Where science, law, and policy collide." *Psychology, Public Policy, and Law*, Vol. 19, No. 2 (2013): 222–34.

[158] Morrison, G.S., Zhang, C., and P. Rose. "An empirical estimate of the precision of likelihood ratios from a forensic-voice-comparison system." *Forensic Science International*, Vol. 208, (2011): 59–65.

[159] OSAC Research Needs Assessment Form. "Study to Assess The Accuracy and Reliability of Firearm and Toolmark." Issued October 2015 (Approved January 2016).  Available at: www.nist.gov/forensics/osac/upload/FATM-Research-Needs-Assessment_Blackbox.pdf.

[160] OSAC Research Needs Assessment Form. "Assessment of Examiners' Toolmark Categorization Accuracy." Issued October 2015 (Approved January 2016).  Available at: www.nist.gov/forensics/osac/upload/FATM-Research-Needs-Assessment_Class-and-individual-marks.pdf.

[161] OSAC Research Needs Assessment Form. "Assessing the Sufficiency and Strength of Friction Ridge Features." Issued October 2015.  Available at: www.nist.gov/forensics/osac/upload/FRS-Research-Need-Assessment-of-Features.pdf.

[162] OSAC Research Needs Assessment Form. "Close Non-Match Assessment." Issued October 2015.  Available at: www.nist.gov/forensics/osac/upload/FRS-Research-Need-Close-Non-Match-Assessment.pdf.

- *Research is needed that studies whether sequential unmasking reduces the negative effects of bias during latent print examination.*[163]

- *The IAI has, for many years, sought support for research that would scientifically validate many of the comparative analyses conducted by its member practitioners. While there is a great deal of empirical evidence to support these exams, independent validation has been lacking.*[164]

The National Commission on Forensic Science has similarly recognized the need for rigorous empirical evaluation of forensic methods in a Views Document approved by the commission:

> *All forensic science methodologies should be evaluated by an independent scientific body to characterize their capabilities and limitations in order to accurately and reliably answer a specific and clearly defined forensic question.*[165]

PCAST applauds this growing focus on empirical evidence. We note that increased research funding will be needed to achieve these critical goals (see Chapter 6).

## 4.9 Summary of Scientific Findings

We summarize our scientific findings concerning the scientific criteria for foundational validity and validity as applied.

---

**Finding 1: Scientific Criteria for Scientific Validity of a Forensic Feature-Comparison Method**

**(1) Foundational validity.** To establish foundational validity for a forensic feature-comparison method, the following elements are required:

(a) a reproducible and consistent procedure for (i) identifying features in evidence samples; (ii) comparing the features in two samples; and (iii) determining, based on the similarity between the features in two sets of features, whether the samples should be declared to be likely to come from the same source ("matching rule"); and

(b) empirical estimates, from appropriately designed studies from multiple groups, that establish (i) the method's false positive rate—that is, the probability it declares a proposed identification between samples that actually come from different sources and (ii) the method's sensitivity—that is, the probability it declares a proposed identification between samples that actually come from the same source.

---

[163] OSAC Research Needs Assessment Form. "ACE-V Bias." Issued October 2015. Available at: www.nist.gov/forensics/osac/upload/FRS-Research-Need-ACE-V-Bias.pdf.

[164] International Association for Identification. Letter to Patrick J. Leahy, Chairman, Senate Committee on the Judiciary, March 18, 2009. Available at: www.theiai.org/current_affairs/nas_response_leahy_20090318.pdf.

[165] National Commission on Forensic Science: "Views of the Commission Technical Merit Evaluation of Forensic Science Methods and Practices." Available at: www.justice.gov/ncfs/file/881796/download.

As described in Box 4, scientific validation studies should satisfy a number of criteria: (a) they should be based on sufficiently large collections of known and representative samples from relevant populations; (b) they should be conducted so that the examinees have no information about the correct answer; (c) the study design and analysis plan should be specified in advance and not modified afterwards based on the results; (d) the study should be conducted or overseen by individuals or organizations with no stake in the outcome; (e) data, software and results should be available to allow other scientists to review the conclusions; and (f) to ensure that the results are robust and reproducible, there should be multiple independent studies by separate groups reaching similar conclusions.

Once a method has been established as foundationally valid based on adequate empirical studies, claims about the method's accuracy and the probative value of proposed identifications, in order to be valid, must be based on such empirical studies.

For objective methods, foundational validity can be established by demonstrating the reliability of each of the individual steps (feature identification, feature comparison, matching rule, false match probability, and sensitivity).

For subjective methods, foundational validity can be established *only* through black-box studies that measure how often many examiners reach accurate conclusions across many feature-comparison problems involving samples representative of the intended use. In the absence of such studies, a subjective feature-comparison method cannot be considered scientifically valid.

Foundational validity is a *sine qua non*, which can only be shown through empirical studies. Importantly, good professional practices—such as the existence of professional societies, certification programs, accreditation programs, peer-reviewed articles, standardized protocols, proficiency testing, and codes of ethics—cannot substitute for empirical evidence of scientific validity and reliability.

**(2) Validity as applied.** Once a forensic feature-comparison method has been established as foundationally valid, it is necessary to establish its validity as applied in a given case.

As described in Box 5, validity as applied requires that: (a) the forensic examiner must have been shown to be *capable* of reliably applying the method, as shown by appropriate proficiency testing (see Section 4.6), and must *actually* have done so, as demonstrated by the procedures actually used in the case, the results obtained, and the laboratory notes, which should be made available for scientific review by others; and (b) assertions about the probative value of proposed identifications must be scientifically valid— including that examiners should report the overall false positive rate and sensitivity for the method established in the studies of foundational validity; demonstrate that the samples used in the foundational studies are relevant to the facts of the case; where applicable, report probative value of the observed match based on the specific features observed in the case; and not make claims or implications that go beyond the empirical evidence.

★ 66 ★

**DEFENDANT'S EXHIBIT**

## 5.5 Firearms Analysis

### Methodology

In firearms analysis, examiners attempt to determine whether ammunition is or is not associated with a *specific* firearm based on toolmarks produced by guns on the ammunition.[310,311] (Briefly, gun barrels are typically rifled to improve accuracy, meaning that spiral grooves are cut into the barrel's interior to impart spin on the bullet. Random individual imperfections produced during the tool-cutting process and through "wear and tear" of the firearm leave toolmarks on bullets or casings as they exit the firearm. Parts of the firearm that come into contact with the cartridge case are machined by other methods.)

The discipline is based on the idea that the toolmarks produced by different firearms vary substantially enough (owing to variations in manufacture and use) to allow components of fired cartridges to be identified with particular firearms. For example, examiners may compare "questioned" cartridge cases from a gun recovered from a crime scene to test fires from a suspect gun.

Briefly, examination begins with an evaluation of class characteristics of the bullets and casings, which are features that are permanent and predetermined before manufacture. If these class characteristics are different, an elimination conclusion is rendered. If the class characteristics are similar, the examination proceeds to identify and compare individual characteristics, such as the striae that arise during firing from a particular gun. According to the Association of Firearm and Tool Mark Examiners (AFTE) the "most widely accepted method used in conducting a toolmark examination is a side-by-side, microscopic comparison of the markings on a questioned material item to known source marks imparted by a tool."[312]

### Background

In the previous section, PCAST expressed concerns about certain foundational documents underlying the scientific discipline of firearm and tool mark examination. In particular, we observed that AFTE's "Theory of Identification as it Relates to Toolmarks"—which defines the criteria for making an identification—is circular.[313] The "theory" states that an examiner may conclude that two items have a common origin if their marks are in "sufficient agreement," where "sufficient agreement" is defined as the examiner being convinced that the items are extremely unlikely to have a different origin. In addition, the "theory" explicitly states that conclusions are subjective.

---

[310] Examiners can also undertake other kinds of analysis, such as for distance determinations, operability of firearms, and serial number restorations as well as the analyze primer residue to determine whether someone recently handled a weapon.

[311] For more complete descriptions, see, for example, National Research Council. *Strengthening Forensic Science in the United States: A Path Forward.* The National Academies Press. Washington DC. (2009), and archives.fbi.gov/archives/about-us/lab/forensic-science-communications/fsc/july2009/review/2009_07_review01.htm.

[312] See: Foundational Overview of Firearm/Toolmark Identification tab on afte.org/resources/swggun-ark (accessed May 12, 2016).

[313] Association of Firearm and Tool Mark Examiners. "Theory of Identification as it Relates to Tool Marks: Revised," *AFTE Journal*, Vol. 43, No. 4 (2011): 287.

Much attention in this scientific discipline has focused on trying to prove the notion that every gun produces "unique" toolmarks. In 2004, the NIJ asked the NRC to study the feasibility, accuracy, reliability, and advisability of developing a comprehensive national ballistics database of images from bullets fired from all, or nearly all, newly manufactured or imported guns for the purpose of matching ballistics from a crime scene to a gun and information on its initial owner.

In its 2008 report, an NRC committee, responding to NIJ's request, found that "the validity of the fundamental assumptions of uniqueness and reproducibility of firearms-related toolmarks" had not yet been demonstrated and that, given current comparison methods, a database search would likely "return too large a subset of candidate matches to be practically useful for investigative purposes."[314]

Of course, it is not necessary that toolmarks be unique for them to provide useful information whether a bullet may have been fired from a particular gun. However, it is *essential* that the accuracy of the method for comparing them be known based on empirical studies.

Firearms analysts have long stated that their discipline has near-perfect accuracy. In a 2009 article, the chief of the Firearms-Toolmarks Unit of the FBI Laboratory stated that "a qualified examiner will rarely if ever commit a false-positive error (misidentification)," citing his review, in an affidavit, of empirical studies that showed virtually no errors.[315]

With respect to firearms analysis, the 2009 NRC report concluded that "sufficient studies have not been done to understand the reliability and reproducibility of the methods"—that is, that the foundational validity of the field had not been established.[316]

The Scientific Working Group on Firearms Analysis (SWGGUN) responded to the criticisms in the 2009 NRC report by stating that:

> *The SWGGUN has been aware of the scientific and systemic issues identified in this report for some time and has been working diligently to address them. . . . [the NRC report] identifies the areas where we must fundamentally improve our procedures to enhance the quality and reliability of our scientific results, as well as better articulate the basis of our science.[317]*

---

[314] National Research Council. *Ballistic Imaging.* The National Academies Press. Washington DC. (2008): 3-4.

[315] See: www.fbi.gov/about-us/lab/forensic-science-communications/fsc/july2009/review/2009_07_review01.htm.

[316] The report states that "Toolmark and firearms analysis suffers from the same limitations discussed above for impression evidence. Because not enough is known about the variabilities among individual tools and guns, we are not able to specify how many points of similarity are necessary for a given level of confidence in the result. Sufficient studies have not been done to understand the reliability and repeatability of the methods. The committee agrees that class characteristics are helpful in narrowing the pool of tools that may have left a distinctive mark." National Research Council. *Strengthening Forensic Science in the United States: A Path Forward.* The National Academies Press. Washington DC. (2009): 154.

[317] See: www.swggun.org/index.php?option=com_content&view=article&id=37&Itemid=22.

### Non-black-box studies of firearms analysis: Set-based analyses

Because firearms analysis is at present a subjective feature-comparison method, its foundational validity can *only* be established through multiple independent black box studies, as discussed above.

Although firearms analysis has been used for many decades, only relatively recently has its validity been subjected to meaningful empirical testing.  Over the past 15 years, the field has undertaken a number of studies that have sought to estimate the accuracy of examiners' conclusions.  While the results demonstrate that examiners can under some circumstances identify the source of fired ammunition, many of the studies were not appropriate for assessing scientific validity and estimating the reliability because they employed artificial designs that differ in important ways from the problems faced in casework.

Specifically, many of the studies employ "set-based" analyses, in which examiners are asked to perform all pairwise comparisons within or between small samples sets.  For example, a "within-set" analysis involving *n* objects asks examiners to fill out an *n* x *n* matrix indicating which of the $n(n$-1)/2 possible pairs match.  Some forensic scientists have favored set-based designs because a small number of objects gives rise to a large number of comparisons.  The study design has a serious flaw, however: the comparisons are not *independent* of one another.  Rather, they entail internal dependencies that (1) constrain and thereby inform examiners' answers and (2) in some cases, allow examiners to make inferences about the study design.  (The first point is illustrated by the observation that if A and B are judged to match, then every additional item C must match either *both* or *neither* of them—cutting the space of possible answers in half.  If A and B match one another but do not match C, this creates additional dependencies.  And so on.  The second point is illustrated by "closed-set" designs, described below.)

Because of the complex dependencies among the answers, set-based studies are not appropriately-designed black-box studies from which one can obtain proper estimates of accuracy.  Moreover, analysis of the empirical results from at least some set-based studies ("closed-set" designs) suggest that they may substantially underestimate the false positive rate.

The Director of the Defense Forensic Science Center analogized set-based studies to solving a "Sudoku" puzzle, where initial answers can be used to help fill in subsequent answers.[318]  As discussed below, DFSC's discomfort with set-based studies led it to fund the first (and, to date, only) appropriately designed black-box study for firearms analysis.

We discuss the most widely cited of the set-based studies below.  We adopt the same framework as for latent prints, focusing primarily on (1) the 95 percent upper confidence limit of the false positive rate and (2) false positive rates based on the proportion of conclusive examinations, as the appropriate measures to report (see p. 91).

---

[318] PCAST interview with Jeff Salyards, Director, DFSC.

### Within-set comparison

Some studies have involved within-set comparisons, in which examiners are presented, for example, with a collection of samples and asked them to determine which samples were fired from the same firearm.  We reviewed two often-cited studies with this design.[319,320]  In these studies, most of the samples were from distinct sources, with only 2 or 3 samples being from the same source.  Across the two studies, examiners identified 55 of 61 matches and made no false positives.  In the first study, the vast majority of different-source samples (97 percent) were declared inconclusive; there were only 18 conclusive examinations for different-source cartridge cases and no conclusive examinations for different-source bullets.[321]  In the second study, the results are only described in brief paragraph and the number of conclusive examinations for different-source pairs was not reported.  It is thus impossible to estimate the false positive rate among conclusive examinations, which is the key measure for consideration (as discussed above).

### Set-to-set comparison/closed set

Another common design has been *between*-set comparisons involving a "closed set."  In this case, examiners are given a set of questioned samples and asked to compare them to a set of known standards, representing the possible guns from which the questioned ammunition had been fired.  In a "closed-set" design, the source gun is

---

[319] Smith, E. "Cartridge case and bullet comparison validation study with firearms submitted in casework." *AFTE Journal*, Vol. 37, No. 2 (2005): 130-5. In this study from the FBI, cartridges and bullets were fired from nine Ruger P89 pistols from casework. Examiners were given packets (of cartridge cases or bullets) containing samples fired from each of the 9 guns and one additional sample fired from one of the guns; they were asked to determine which samples were fired from the same gun. Among the 16 same-source comparisons, there were 13 identifications and 3 inconclusives. Among the 704 different-source comparisons, 97 percent were declared inconclusives, 2.5 percent were declared exclusions and 0 percent false positives.

[320] DeFrance, C.S., and M.D. Van Arsdale. "Validation study of electrochemical rifling." *AFTE Journal*, Vol. 35, No. 1 (2003): 35-7.  In this study from the FBI, bullets were fired from 5 consecutively manufactured Smith & Wesson .357 Magnum caliber rifle barrels. Each of 9 examiners received two test packets, each containing a bullet from each of the 5 guns and two additional bullets (from the different guns in one packet, from the same gun in the other); they were asked to perform all 42 possible pairwise comparisons, which included 37 different-source comparisons. Of the 45 total same-source comparisons, there were 42 identifications and 3 inconclusives. For the 333 total different-source comparisons, the paper states that there were no false positives, but does not report the number of inconclusive examinations.

[321] Some laboratory policies mandate a very high bar for declaring exclusions.

always present.  We analyzed four such studies in detail.[322,323,324,325]  In these studies, examiners were given a collection of questioned bullets and/or cartridge cases fired from a small number of consecutively manufactured firearms of the same make (3, 10, 10, and 10 guns, respectively) and a collection of bullets (or casings) known to have been fired from these same guns.  They were then asked to perform a matching exercise—assigning the bullets (or casings) in one set to the bullets (or casings) in the other set.

This "closed-set" design is simpler than the problem encountered in casework, because the correct answer is always present in the collection.  In such studies, examiners can perform perfectly if they simply match each bullet to the standard that is *closest*.  By contrast, in an open-set study (as in casework), there is no guarantee that the correct source is present—and thus no guarantee that the closest match is correct.  Closed-set comparisons would thus be expected to underestimate the false positive rate.

Importantly, it is not necessary that examiners be told explicitly that the study design involves a closed set.  As one of the studies noted:

> *The participants were not told whether the questioned casings constituted an open or closed set.*
> *However, from the questionnaire/answer sheet, participants could have assumed it was a closed set and*
> *that every questioned casing should be associated with one of the ten slides.[326]*

---

[322] Stroman, A. "Empirically determined frequency of error in cartridge case examinations using a declared double-blind format." *AFTE Journal,* Vol. 46, No. 2 (2014):157-175. In this study, bullets were fired from three Smith & Wesson guns. Each of 25 examiners received a test set containing three questioned cartridge cases and three known cartridge cases from each gun. Of the 75 answers returned, there were 74 correct assignments and one inconclusive examination.

[323] Brundage, D.J. "The identification of consecutively rifled gun barrels." *AFTE Journal*, Vol. 30, No. 3 (1998): 438-44. In this study, bullets were fired from 10 consecutively manufactured 9 millimeter Ruger P-85 semi-automatic pistol barrels. Each of 30 examiners received a test set containing 20 questioned bullets to compare to a set of 15 standards, containing at least one bullet fired from each of the 10 guns. Of the 300 answers returned, there were no incorrect assignments and one inconclusive examination.

[324] Fadul, T.G., Hernandez, G.A., Stoiloff, S., and S. Gulati. "An empirical study to improve the scientific foundation of forensic firearm and tool mark identification utilizing 10 consecutively manufactured slides." *AFTE Journal.* Vol. 45, No. 4 (2013): 376-93. An empirical study to improve the scientific foundation of forensic firearm and tool mark identification utilizing 10 consecutively manufactured slides. In this study, bullets were fired from 10 consecutively manufactured semi-automatic 9mm Ruger pistol slides. Each of 217 examiners received a test set consisting of 15 questioned casings and two known cartridge cases from each of the 10 guns. Of the 3255 answers returned, there were 3239 correct assignments, 14 inconclusive examinations and two false positives.

[325] Hamby, J.E., Brundage, D.J., and J.W. Thorpe. "The identification of bullets fired from 10 consecutively rifled 9mm Ruger pistol barrels: a research project involving 507 participants from 20 countries." *AFTE Journal,* Vol. 41, No. 2 (2009): 99-110. In this study, bullets were fired from 10 consecutively rifled Ruger P-85 barrels. Each of 440 examiners received a test set consisting of 15 questioned bullets and two known standards from each of the 10 guns. Of the 6600 answers returned, there were 6593 correct assignments, seven inconclusive examinations and no false positives.

[326] Fadul, T.G., Hernandez, G.A., Stoiloff, S., and S. Gulati. "An empirical study to improve the scientific foundation of forensic firearm and tool mark identification utilizing 10 consecutively manufactured slides." *AFTE Journal,* Vol. 45, No. 4 (2013): 376-93.

Moreover, as participants find that many of the questioned casings have strong similarities to the known casings, their surmise that matching knowns are always present will tend to be confirmed.

The issue with this study design is not just a theoretical possibility: it is evident in the results themselves. Specifically, the closed-set studies have inconclusive and false-positives rate that are dramatically lower (by more than 100-fold) that those for the partly open design (Miami-Dade study) or fully open, black-box designs (Ames Laboratory) studies described below (Table 2).[327]

In short, the closed-set design is problematic in principle and appears to underestimate the false positive rate in practice.[328]  The design is not appropriate for assessing scientific validity and measuring reliability.

### *Set-to-set comparison/partly open set ('Miami Dade study')*
One study involved a set-to-set comparison in which a few of the questioned samples lacked a matching known standard.[329]  The 165 examiners in the study were asked to assign a collection of 15 questioned samples, fired from 10 pistols, to a collection of known standards; two of the 15 questioned samples came from a gun for which known standards were not provided.  For these two samples, there were 188 eliminations, 138 inconclusives and 4 false positives.  The inconclusive rate was 41.8 percent and the false positive rate among conclusive examinations was 2.1 percent (confidence interval 0.6-5.25 percent).  The false positive rate corresponds to an estimated rate of 1 error in 48 cases, with upper bound being 1 in 19.

As noted above, the results from the Miami-Dade study are sharply different than those from the closed-set studies: (1) the proportion of inconclusive results was 200-fold higher and (2) the false positive rate was roughly 100-fold higher.

## Recent black-box study of firearms analysis

In 2011, the Forensic Research Committee of the American Society of Crime Lab Directors identified, among the highest ranked needs in forensic science, the importance of undertaking a black-box study in firearms analysis analogous to the FBI's black-box study of latent fingerprints.  DFSC, dissatisfied with the design of previous studies of firearms analysis, concluded that a black-box study was needed and should be conducted by an independent testing laboratory unaffiliated with law enforcement that would engage forensic examiners as

---

[327] Of the 10,230 answers returned across the three studies, there were there were 10,205 correct assignments, 23 inconclusive examinations and 2 false positives.

[328] Stroman (2014) acknowledges that, although the test instructions did not explicitly indicate whether the study was closed, their study could be improved if "additional firearms were used and knowns from only a portion of those firearms were used in the test kits, thus presenting an open set of unknowns to the participants. While this could increase the chances of inconclusive results, it would be a more accurate reflection of the types of evidence received in real casework."

[329] Fadul, T.G., Hernandez, G.A., Stoiloff, S., and S. Gulati. "An empirical study to improve the scientific foundation of forensic firearm and tool mark identification utilizing consecutively manufactured Glock EBIS barrels with the same EBIS pattern." National Institute of Justice Grant #2010-DN-BX-K269, December 2013. www.ncjrs.gov/pdffiles1/nij/grants/244232.pdf.

participants in the study.  DFSC and Defense Forensics and Biometrics Agency jointly funded a study by the Ames Laboratory, a Department of Energy national laboratory affiliated with Iowa State University.[330]

### *Independent tests/open ('Ames Laboratory study')*

The study employed a similar design to the FBI's black-box study of latent fingerprints, with many examiners making a series of *independent* comparison decisions between a questioned sample and one or more known samples that may or may not contain the source.  The samples all came from 25 newly purchased 9mm Ruger pistols.[331]  Each of 218 examiners[332] was presented with 15 *separate* comparison problems—each consisting of one questioned sample and three known test fires from the same known gun, which might or might not have been the source.[333]  Unbeknownst to the examiners, there were five same-source and ten different-source comparisons.  (In an ideal design, the proportion of same- and different-source comparisons would differ among examiners.)

Among the 2178 different-source comparisons, there were 1421 eliminations, 735 inconclusives and 22 false positives.  The inconclusive rate was 33.7 percent and the false positive rate among conclusive examinations was 1.5 percent (upper 95 percent confidence interval 2.2 percent).  The false positive rate corresponds to an estimated rate of 1 error in 66 cases, with upper bound being 1 in 46.  (It should be noted that 20 of the 22 false positives were made by just 5 of the 218 examiners—strongly suggesting that the false positive rate is highly heterogeneous across the examiners.)

The results for the various studies are shown in Table 2.  The tables show a striking difference between the closed-set studies (where a matching standard is always present by design) and the non-closed studies (where there is no guarantee that any of the known standards match).  Specifically, the closed-set studies show a dramatically lower rate of inconclusive examinations and of false positives.  With this unusual design, examiners succeed in answering all questions and achieve essentially perfect scores.  In the more realistic open designs, these rates are much higher.

---

[330] Baldwin, D.P., Bajic, S.J., Morris, M., and D. Zamzow. "A study of false-positive and false-negative error rates in cartridge case comparisons." Ames Laboratory, USDOE, Technical Report #IS-5207 (2014) afte.org/uploads/documents/swggun-false-postive-false-negative-usdoe.pdf.

[331] One criticism, raised by a forensic scientist, is that the study did not involve *consecutively manufactured* guns.

[332] Participants were members of AFTE who were practicing examiners employed by or retired from a national or international law enforcement agency, with suitable training.

[333] Actual casework may involve more complex situations (for example, many different bullets from a crime scene). But, a proper assessment of foundational validity must *start* with the question of how often an examiner can determine whether a questioned bullet comes from a specific known source.

## Table 2: Results From Firearms Studies*

| Study Type | Results for different-source comparisons | | | | |
| --- | --- | --- | --- | --- | --- |
| | Raw Data | Inconclusives | False positives among conclusive exams[334] | | |
| | Exclusions/ Inconclusives/ False positives | | Freq. (Confidence Bound) | Estimated Rate | Bound on Rate |
| Set-to-set/closed (*four studies*) | 10,205/23/2 | 0.2% | 0.02% (0.06%) | 1 in 5103 | 1 in 1612 |
| Set-to-set/partly open (*Miami-Dade study*) | 188/138/4 | 41.8% | 2.0% (4.7%) | 1 in 49 | 1 in 21 |
| Black-box study (*Ames Laboratory study*) | 1421/735/22 | 33.7% | 1.5% (2.2%) | 1 in 66 | 1 in 46 |

* "Inconclusives": Proportion of total examinations that were called inconclusive. "Raw Data": Number of false positives divided by number of conclusive examinations involving questioned items without a corresponding known (for set-to-set/slightly open) or non-mated pairs (for independent/open). "Freq. (Confidence Bond)": Point estimate of false positive frequency, with the upper 95 percent confidence bounds. "Estimated": The odds of a false positive occurring, based on the observed proportion of false positives. "Bound": The odds of a false positive occurring, based on the upper bound of the confidence interval—that is, the rate could reasonably be as high as this value.

## Conclusions

The early studies indicate that examiners can, under some circumstances, associate ammunition with the gun from which it was fired.  However, as described above, most of these studies involved designs that are not appropriate for assessing the scientific validity or estimating the reliability of the method as practiced.  Indeed, comparison of the studies suggests that, because of their design, many frequently cited studies seriously underestimate the false positive rate.

At present, there is only a single study that was appropriately designed to test foundational validity and estimate reliability (Ames Laboratory study).  Importantly, the study was conducted by an independent group, unaffiliated with a crime laboratory.  Although the report is available on the web, it has not yet been subjected to peer review and publication.

The scientific criteria for foundational validity require appropriately designed studies by *more than one group* to ensure reproducibility.  Because there has been only a single appropriately designed study, the current evidence falls short of the scientific criteria for foundational validity.[335]  There is thus a need for additional, appropriately designed black-box studies to provide estimates of reliability.

---

[334] The rates for *all* examinations are, reading across rows: 1 in 5115; 1 in 1416; 1 in 83; 1 in 33; 1 in 99; and 1 in 66.

[335] The DOJ asked PCAST to review a recent paper, published in July 2016, and judge whether it constitutes an additional appropriately designed black-box study of firearms analysis (that is, the ability to associate ammunition with a *particular* gun).  PCAST carefully reviewed the paper, including interviewing the three authors about the study design.  Smith, T.P.,

★ 111 ★

> **Finding 6: Firearms analysis**
>
> **Foundational validity**. PCAST finds that firearms analysis currently falls short of the criteria for foundational validity, because there is only a single appropriately designed study to measure validity and estimate reliability.  The scientific criteria for foundational validity require more than one such study, to demonstrate reproducibility.
>
> Whether firearms analysis should be deemed admissible based on current evidence is a decision that belongs to the courts.
>
> If firearms analysis is allowed in court, the scientific criteria for validity as applied should be understood to require clearly reporting the error rates seen in appropriately designed black-box studies (estimated at 1 in 66, with a 95 percent confidence limit of 1 in 46, in the one such study to date).

---

Smith, G.A., and J.B. Snipes. "A validation study of bullet and cartridge case comparisons using samples representative of actual casework." *Journal of forensic sciences* Vol. 61, No. 4 (2016): 939-946.

The paper involves a novel and complex design that is unlike any previous study.  Briefly, the study design was as follows: (1) six different types of ammunition were fired from eight 40 caliber pistols from four manufacturers (two Taurus, two Sig Sauer, two Smith and Wesson, and two Glock) that had been in use in the general population and obtained by the San Francisco Police Department; (2) tests kits were created by randomly selecting 12 samples (bullets or cartridge cases); (3) 31 examiners were told that the ammunition was all recovered from a single crime scene and were asked to prepare notes describing their conclusions about which sets of samples had been fired from the same gun; and (4) based on each examiner's notes, the authors sought to re-create the logical path of comparisons followed by each examiner and calculate statistics based on this inferred numbers of comparisons performed by each examiner.

While interesting, the paper clearly is not a black-box study to assess the reliability of firearms analysis to associate ammunition with a particular gun, and its results cannot be compared to previous studies.  Specifically: (1) The study employs a *within-set comparison* design (interdependent comparisons within a set) rather than a *black-box* design (many independent comparisons); (2) The study involves only a small number of examiners; (3) The central question with respect to firearms analysis is whether examiners can associate spent ammunition with a *particular* gun, not simply with a particular *make* of gun.  To answer this question, studies must assess examiners' performance on ammunition fired from different guns of the *same make* ("within-class" comparisons) rather than from guns of *different makes* ("between-class" comparison); the latter comparison is much simpler because guns of different makes produce marks with distinctive "class" characteristics (due to the design of the gun), whereas guns of the same make must be distinguished based on "randomly acquired" features of each gun (acquired during rifling or in use).  Accordingly, previous studies have employed only within-class comparisons.  In contrast, the recent study consists of a mixture of within- vs. between-class comparisons, with the substantial majority being the simpler between-class comparisons.  To estimate the false-positive rate for *within-class* comparisons (the relevant quantity), one would need to know the number of independent tests involving different-source within-class comparisons resulting in conclusive examinations (identification or elimination).  The paper does not distinguish between within- and between-class comparisons, and the authors noted that they did not perform such analysis.

PCAST's comments are not intended as a criticism of the recent paper, which is a novel and valuable research project.  They simply respond to DOJ's specific question: the recent paper does not represent a black-box study suitable for assessing scientific validity or estimating the accuracy of examiners to associate ammunition with a *particular* gun.

**Validity as applied**. If firearms analysis is allowed in court, validity as applied would, from a scientific standpoint, require that the expert:

(1) has undergone rigorous proficiency testing on a large number of test problems to evaluate his or her capability and performance, and discloses the results of the proficiency testing; and

(2) discloses whether, when performing the examination, he or she was aware of any other facts of the case that might influence the conclusion.

### The Path Forward

Continuing efforts are needed to improve the state of firearms analysis—and these efforts will pay clear dividends for the criminal justice system.

One direction is to continue to improve firearms analysis as a subjective method. With only one black-box study so far, there is a need for additional black-box studies based on the study design of the Ames Laboratory black-box study. As noted above, the studies should be designed and conducted in conjunction with third parties with no stake in the outcome (such as the Ames Laboratory or research centers such as the Center for Statistics and Applications in Forensic Evidence (CSAFE)). There is also a need for more rigorous proficiency testing of examiners, using problems that are appropriately challenging and publically disclosed after the test.

A second—and more important—direction is (as with latent print analysis) to convert firearms analysis from a subjective method to an objective method.

This would involve developing and testing image-analysis algorithms for comparing the similarity of tool marks on bullets. There have already been encouraging steps toward this goal.[336] Recent efforts to characterize 3D images of bullets have used statistical and machine learning methods to construct a quantitative "signature" for each bullet that can be used for comparisons across samples. A recent review discusses the potential for surface topographic methods in ballistics and suggests approaches to use these methods in firearms examination.[337] The authors note that the development of optical methods have improved the speed and accuracy of capturing surface topography, leading to improved quantification of the degree of similarity.

---

[336] For example, a recent study used data from three-dimensional confocal microscopy of ammunition to develop a similarity metric to compare images. By performing all pairwise comparisons among a total of 90 cartridge cases fired from 10 pistol slides, the authors found that the distribution of the metric for same-gun pairs did not overlap the distribution of the metric for different-gun pairs. Although a small study, it is encouraging. Weller, T.J., Zheng, X.A., Thompson, R.M., and F. Tulleners. "Confocal microscopy analysis of breech face marks on fired cartridge cases from 10 consecutively manufactured pistol slides." *Journal of Forensic Sciences,* Vol. 57, No. 4 (2012): 912-17.

[337] Vorburger, T.V., Song, J., and N. Petraco. "Topography measurements and applications in ballistics and tool mark identification." *Surface topography: Metrology and Properties*, Vol. 4 (2016) 013002.

In a recent study, researchers used images from an earlier study to develop a computer-assisted approach to match bullets that minimizes human input.[338]  The group's algorithm extracts a quantitative signature from a bullet 3D image, compares the signature across two or more samples, and produces a "matching score," reflecting the strength of the match.  On the small test data set, the algorithm had a very low error rate.

There are additional efforts in the private sector focused on development of accurate high-resolution cartridge casing representations to improve accuracy and allow for higher quality scoring functions to improve and assign match confidence during database searches.  The current NIBIN database uses older (non-3D) technology and does not provide a scoring function or confidence assignment to each candidate match.  It has been suggested that a scoring function could be used for blind verification for human examiners.

Given the tremendous progress over the past decade in other fields of image analysis, we believe that fully automated firearms analysis is likely to be possible in the near future.  However, efforts are currently hampered by lack of access to realistically large and complex databases that can be used to continue development of these methods and validate initial proposals.

NIST, in coordination with the FBI Laboratory, should play a leadership role in propelling this transformation by creating and disseminating appropriate large datasets.  These agencies should also provide grants and contracts to support work—and systematic processes to evaluate methods.  In particular, we believe that "prize" competitions—based on large, publicly available collections of images[339]—could attract significant interest from academic and industry.

## 5.6 Footwear Analysis: Identifying Characteristics

### Methodology

Footwear analysis is a process that typically involves comparing a known object, such as a shoe, to a complete or partial impression found at a crime scene, to assess whether the object is likely to be the source of the impression.  The process proceeds in a stepwise manner, beginning with a comparison of "class characteristics" (such as design, physical size, and general wear) and then moving to "identifying characteristics" or "randomly acquired characteristics (RACs)" (such as marks on a shoe caused by cuts, nicks, and gouges in the course of use).[340]

In this report, we do not address the question of whether examiners can reliably determine class characteristics—for example, whether a particular shoeprint was made by a size 12 shoe of a particular make. While it is important that that studies be undertaken to estimate the reliability of footwear analysis aimed at

---

[338] Hare, E., Hofmann, H., and A. Carriquiry. "Automatic matching of bullet lands." Unpublished paper, available at: arxiv.org/pdf/1601.05788v2.pdf.

[339] On July 7, 2016 NIST released the NIST Ballistics Toolmark Research Database (NBTRD) as an open-access research database of bullet and cartridge case toolmark data (tsapps.nist.gov/NRBTD). The database contains reflectance microscopy images and three-dimensional surface topography data acquired by NIST or submitted by users.

[340] See: SWGTREAD Range of Conclusions Standards for Footwear and Tire Impression Examinations (2013). SWGTREAD Guide for the Examination of Footwear and Tire Impression Evidence (2006) and Bodziak W. J. *Footwear Impression Evidence: Detection, Recovery, and Examination*. 2nd ed. CRC Press-Taylor & Francis, Boca Raton, Florida (2000): p 347.

# Exhibit D

**New York City Police Department**
**Police Laboratory – Firearms Analysis Section**
**Procedure Manual – Fired Evidence Examination**

**Page 1 of 3**

**FAS-06**

**6.1     PURPOSE**

To provide the firearms examiner a method to examine and evaluate tool marks transferred to cartridge components by a firearm and/or a firearm accessory. Other procedures will be referenced as necessary during the course of this procedure.

**6.2     GENERAL CONSIDERATIONS**

There are no General Considerations applicable to this chapter.

**6.3     SAFETY PROCEDURES**

Refer to *Firearms Safety* regarding the safe handling of firearms and the *Safety Manual* for general laboratory safety procedures.

**6.4     QUALITY CONTROL PROCEDURES**

The following chapters in the *Quality Control Manual* include QC procedures applicable to this procedure:

- **BALANCES**
- **CALIPERS**

**6.5     PROCEDURES**

**6.5.1     PRELIMINARY EXAMINATION**

Upon receipt of case for examination:

1. Prepare applicable worksheets
2. Follow procedures outlined in the *Opening of Firearm-Related Evidence* chapter.
3. Visually inspect the evidence to determine the presence of any trace evidence. Confer with a supervisor, the case detective, prosecuting attorney, and/or the Police Laboratory's Criminalistics Section should any trace evidence be encountered.
4. Clean evidence as necessary:
   a. For evidence containing suspected blood, tissue or other biohazards, soak the evidence for at least ten minutes in a 10% bleach solution.
   b. Rinse with soapy water to remove any loose material.
   c. Lead bullets get a final water rinse.
   d. All other evidence gets rinsed/wiped with acetone.
5. Mark evidence as required.

**6.5.2     AMMUNITION CHARACTERIZATION**

The firearms examiner may examine both fired and unfired ammunition components in an attempt to identify various characteristics of those components.

UNCONTROLLED

TUCKER001218

Case 1:18-cr-00119-SJ    Document 49-1    Filed 07/19/19    Page 53 of 63 PageID #: 705

**New York City Police Department**
**Police Laboratory – Firearms Analysis Section**
**Procedure Manual – Fired Evidence Examination**

**Page 2 of 3**

**FAS-06**

### 6.5.3    FIRED BULLET EXAMINATION

1.  The caliber, or the base diameter, of a bullet is one of the class characteristics of a bullet that a firearms examiner may use to identify or eliminate a certain firearm. To determine a bullet's caliber class the firearms examiner may:
    a.  Measure the base of the evidence bullet with a verified caliper
    b.  Weigh the evidence bullet on a verified balance
    c.  Compare the physical characteristics of the evidence bullet to a known sample
2.  Other bullet characteristics may allow the firearms examiner to create a list of possible firearms that could have discharged the evidence bullet. The General Rifling Characteristics (GRC) database is used to look up the physical characteristics of a bullet to determine a list of possible firearms that could have fired it. The results obtained from the GRC database is for reference purposes only and the data contained therein is not all inclusive. GRC search parameters for bullets include:
    a.  Type of rifling
    b.  Number of lands and grooves
    c.  Direction of rifling twist
    d.  Width of lands / grooves
3.  Further microscopic examination of the evidence bullet will allow the firearms examiner to conclude if the bullet bears markings making it suitable for microscopic comparison.

### 6.5.4    CARTRIDGE CASE EXAMINATION

1.  For the purposes of this procedure, the term "cartridge case" may refer to a fired or unfired cartridge case or shot shell hull.
2.  The firearms examiner may use various identifiers found on cartridge cases to identify it. These may include:
    a.  Headstamp information (e.g caliber, manufacturer/marketer)
    b.  Description of case and primer finish
    c.  Ignition system
    d.  Presence of primer sealant
3.  Further microscopic examination of the cartridge case will allow the firearms examiner to conclude if the markings observed will make it suitable for microscopic comparison. Markings may include:
    a.  Firing pin impression
    b.  Breech face marks
    c.  Extractor and ejector marks
    d.  Other identifiable markings (chamber, magazine and/or ejection marks or other marks of value)

UNCONTROLLED

TUCKER001219

**New York City Police Department**
**Police Laboratory – Firearms Analysis Section**
**Procedure Manual – Fired Evidence Examination**

**Page 3 of 3**

**FAS-06**

**6.6    INTERPRETATION OF RESULTS**

The class and individual characteristics observed on fired ammunition components enables opinions of common origin to be made when the unique surface contours of two toolmarks are in "sufficient agreement".

**6.7    REPORTING PROCEDURES**

A minimum of one photograph must be taken of a representative area of a positive comparison and documented on the appropriate worksheet. Refer to *Report Writing* for appropriate statements.

**6.8    REFERENCES**

American Institute of Applied Science Firearms Identification Lesson 5, *AFTE Journal*, 14(3), 69–73.

Association of Firearm and Tool Mark Examiners (U.S.). (Ed.). (1994). *Glossary of the Association of Firearm and Tool Mark Examiners* (3rd ed.). Augusta, GA: Fonville Print. Co.

Barnes, F. C. (1993). *Cartridges of the World* (7th ed.). Northbrook, IL: DBI Books Inc.

Howe, W. J. (1969). Laboratory Work Sheets. *AFTE Newsletter*, 2, 13–15.

Mathews, J. H. (1973) *Firearms Identification* (Vol. I). Springfield, IL: Charles C. Thomas.

UNCONTROLLED

TUCKER001220

# Exhibit E

Copyright ARC 2019

# *A*thena *R*esearch & *C*onsulting LLC



PO Box 66, Bippus, Indiana 46713, USA.

Tel  260 344 1314

---

## Curriculum Vitae (v6.98, February 2019)

### Eur Ing John Nixon
CEng  D-IBFES  BEng(Hons)  MBA  FIMechE  FCMI  F-AAFS
Board Certified Forensic Engineering Scientist

## Summary

Specializing in weapons systems research, consulting, and litigation support. Technical areas include firearms, ballistics, ammunition, munitions, explosives, plus related crime & accident scene reconstruction, and intellectual property. Provided sworn testimony over 50 times in numerous US state & federal courts. Published & presented numerous research papers, and delivered many training seminars to attorneys, forensic scientists, engineers, law enforcement, and investigators. Certified Range Safety Officer and Pistol & Personal Protection Instructor.

## Professional Qualifications & Memberships

| | |
|---|---|
| 2016 | Diplomate; International Board of Forensic Engineering Sciences (D-IBFES) |
| 2013 | Fellow; American Academy of Forensic Sciences (F-AAFS) |
| 2011 | Fellow; Chartered Management Institute (FCMI) |
| 2005 | Member; International Society of Explosives Engineers (ISEE) |
| 2001 | Professional Licensed Member of National Society of Professional Engineers (NSPE) |
| 2001 | Registered Professional Engineer with FEANI (Eur Ing) (approx 30 countries) |
| 2000 | Member; American Society of Mechanical Engineers (ASME) |
| 1999 | Fellow; Institution of Mechanical Engineers (FIMechE) |
| 1997 | Founder Member; Expert Witness Institute (MEWI) (past member) |
| 1995 | Vetted by the UK Law Society (expert consultant / expert witness) |
| 1992 | Member; Institute of Materials (MIM) (past member) |
| 1992 | Qualified as a Chartered Professional Engineer with the British Engineering Council (CEng) |

## Offices Held & Awards

| | |
|---|---|
| 2016 - 2017 | AAFS, Engineering Sciences Section, Founder's Award. |
| 2016 - 2017 | AAFS, Engineering Sciences Section, Chair. |
| 2015 - 2016 | AAFS, Engineering Sciences Section, Chair. |
| 2014 - 2015 | AAFS, Engineering Sciences Section, Secretary. |
| 2009 - 2010 | Indiana Society of Professional Engineers, State President. |
| 2007 - Present | Indiana Society of Professional Engineers, Anthony Wayne Chapter President. |

Copyright ARC 2019

## Employment History

2000 – Now    Consultant with ARC
(technical & forensic research & consulting - firearms / munitions / reconstruction)

2000 – 2004    Adjunct Professor at Indiana Institute of Technology, lecturing advanced courses on BA & BSc degree programs.

1996 - 2000    Self-employed consultant in UK (technical, forensic, and business consulting)

1986 -1999    United Kingdom Ministry of Defence, Whitehall, Westminster, London.
Scientist / professional engineer / project manager - working on guns, ammunition, missiles, rocketry, and energetic materials (explosives & pyrotechnics). Projects involved research, design, development, performance assessment, mid-life improvement, reverse engineering, and forensics.

## Academic Qualifications

1997    Henley Business School, Reading University /Henley Management College, Brunel University
Master's Degree in Business Administration (MBA)

1990    University of Greenwich, London, UK / Thames Polytechnic / Woolwich Polytechnic
Bachelor's Degree in Mechanical Engineering (BEng: - with First Class Honors).
Recognized in the US under the terms of the Washington Accord

## Supplementary Education and Training

95-97    Courtroom skills and report writing training courses from Bond Solon and The Academy of Experts.

86-99    Various internal and external training courses in areas such as safety, procurement management, space technology, desert survival, counter terrorism tactics, risk management, etc.

86-92    Various military technology and tactics training courses undertaken at **Royal Military College of Science** - RMCS (Cranfield University Defence Academy of the UK). These included explosives technology, ordnance and munitions design, IED design & construction, plus extensive training in ammunition & ballistics (internal, intermediate, external, and terminal – including wound ballistics).

1982    Gateshead Technical College, Gateshead, Tyne & Wear, United Kingdom.
Non-destructive testing (NDT) technology (3 months). Radiographic, ultrasonic, MPI and dye penetrant techniques.

77-81    4 year engineering apprenticeship with British Steel Corporation. (CGLI & TEC qualifications)

## Patents / Patent Applications

GB 9214637.2  Plastic Tail Fin Unit
Describes new fin geometry & materials (and related manufacturing process) which improve long rod tank penetrator terminal performance, and reduce production costs. 9 July 1992.

Copyright ARC 2019 Vol.98 Feb 2019

GB 9216295.7 Long Range Artillery Shell
Describes several 155mm artillery shell design concepts capable of extending maximum range to 60km by using base-bleed and rocket technology. 31 July 1992.

Also creator of numerous inventions that were not submitted for patent protection due to security restrictions.

### Partial (allowable) Listing of Research Papers (UK Government 1987 - 1999)

Sept 99   A Review of Non-Destructive Evaluation Techniques Suitable for Solid Propellant Rocket Motors. UK Government Publication.

Apr 99    A Review of Non-Destructive Evaluation Techniques Suitable for Solid Propellant Rocket Motors. UK Government Publication.

Plus **at least 18 other bound UK government research / project papers** with classified titles and classified content that cannot be divulged. Individuals with appropriate security clearances may obtain a full listing of titles, and copies, from: Defence Research Information Center, Kentigern House, 65 Brown Street, Glasgow G2 8EX, United Kingdom.

### Publications (non-government)

Evaluation of mono-molecular surface modifiers applied to bullets and rifle barrels, and their influence on drag, velocity, consistency, accuracy, and copper fouling. Varmint Hunter Magazine, April 1999.

Contributor to article on 32 ACP caliber suitability for self defence. American Handgunner 2002 Tactical Annual.

Major contributor to Beltway Sniper article authored by Janet Rae-Dupree, US News & World Report, October 2002.

Major contributor (including microscope photography) to Newsweek Special Report – 'The Sick World of the Snipers, The Inside Story of an Epic Manhunt. Newsweek, November 4, 2002.

Major contributor to article on 'ballistic fingerprinting' by Kyle Orland, Suburban Newsline (a publication of the University of Maryland) 2002.

An Overview of **Forensic Firearms Engineering**, Indiana Professional Engineer, Volume 69 No 6, November / December 2006, pp14-16.

Forensic Firearms Engineering - **Blame Apportionment - Products v Operators**, Indiana Professional Engineer, Volume 70 No 1, January / February 2007, pp13-17.

Forensic Firearms Engineering - **Toolmark Analysis**; Linking Cartridge Cases and Bullets to Individual Firearms. Indiana Professional Engineer, Volume 70 No 2, March / April 2007, pp13-16.

Forensic Firearms Engineering - **Terminal Effects**; The Consequences of Being on the Wrong End of a Firearm. Indiana Professional Engineer, Volume 70 No 3, May / June 2007, pp11-15.

Copyright ARC 2019
V6.98 Feb 2019

Forensic Firearms Engineering - **Shooting Incident Scene Reconstruction: Part 1** - Bullet Impact Area Identification and Interpretation. Indiana Professional Engineer, Volume 70 No 4, July / August 2007, pp13-16.

Forensic Firearms Engineering - **Shooting Incident Scene Reconstruction: Part 2** - Bullet Hole ID and Distance Determinations. Indiana Professional Engineer, Volume 70 No 5, Sept / Oct 2007, pp13-14.

Forensic Firearms Engineering - **Shooting Incident Scene Reconstruction: Part 3** - Ejection Pattern Testing & Analysis. Indiana Professional Engineer, Volume 71 No 2, Mar / Apr 2008, pp12-15.

**Forensic Engineering Analysis of Firearm Trigger Incidents**. NAFE Journal, Volume XXV, No. 2, December 2008 (Published May 2010) pp. 119 to 134.

**Forensic Engineering Analysis of Firearm Silencers**, NAFE Journal, Volume XXVI, No. 2, December 2009 (Published October 2012), pp. 39 -50.

Forensic Firearms Engineering - **Employing Hands-on Engineering Skills, Plus Engineering Theory & Calculations, to Analyze & Resolve Complex Design & Safety Liability Issues**, Indiana Professional Engineer, Volume 75 No 4, July / August 2012, pp. 13-27.


**Scientific Paper Presentations and Training Seminars Delivered**

Presented over 50 continuing education courses and scientific papers between 2001 and 2018. Subjects have included firearms, ballistics, wound ballistics, tool mark comparison, ammunition, crime /accident scene reconstruction, explosives, destructive devices. Attendees have included law enforcement, investigators, attorneys, judges, engineers, scientists, medical professionals, law and forensic science students. Courses have been approved for continuing education credit in most states.

| | |
|---|---|
| Nov 01 | **Training seminar on forensic firearms, ballistics, & wound ballistics** at University of Louisville Law School. Accredited for CLE by Kentucky Bar Association. |
| May 02 | **Lectured in forensic firearms and ballistics** at Ohio University Forensic Science School. |
| Apr 03 | **Presented a one day training seminar on forensic firearms, ballistics, & wound ballistics** to 60+ Chicago lawyers and investigators. |
| Sep 03 | **Training seminar in forensic firearms, ballistics, & wound ballistics** in Indianapolis. Accredited for CLE by Indiana Commission on Legal Education. |
| Oct 03 | **Training seminar on forensic firearms & ballistics** at DePaul University, Chicago. |
| Dec 03 | **Training seminar on forensic firearms, ballistics, & wound ballistics** in Indianapolis. Accredited for CLE by Indiana Commission on Legal Education. |
| Feb 04 | **Training seminar on forensic firearms, ballistics, & wound ballistics** in Indianapolis. Accredited for CLE by Indiana Commission on Legal Education. |
| Mar 04 | **Two training seminars on firearms, ballistics, & wound ballistics** (14 & 15 March 04). NLADA Life in the Balance conference, Memphis Tennessee. Accredited for CLE in most States. |
| Apr 04 | **Keynote Speaker at Emergency Nurses Association Regional Forensic Science Conference**, Memphis TN. Accredited for CLE by the Emergency Nurses Association. |
| Jan 05 | **Firearms & Ballistics for Law Enforcement**, Columbia City Sheriff's Department, Indiana. |

Copyright ARC 2019

| | |
|---|---|
| Mar 05 | **Training seminar on explosives** at the NDIA Annual Conference, Chicago, IL. |
| Mar / Apr 05 | **Two training seminars on Firearms & ballistics**, at the NDIA Annual Conference, Chicago, IL. |
| Oct 05 | **Training seminar on firearms, ballistics**, and wound ballistics at Rochester Institute of Technology NY. |
| Sept 06 | **Two training seminars on firearms, ballistics, & wound ballistics** at the NDIA Conference in Washington DC. |
| Feb 07 | **Accreditation v TQM, Do We Need Either, Do We Need Both ?** Paper Presented at 59th AAFS Annual Scientific Meeting, San Antonio, TX. |
| Apr 07 | **Training Seminar on forensic firearms & ballistics**. at the 70th Annual Convention of the Indiana Society of Professional Engineers, 26 to 28 April 2007. |
| Jun 07 | **Training seminar on firearms, ballistics & wound ballistics.** Maryland Public Defender Annual Training Seminar, 14 to 16 June 2007, Potomac, MD. |
| Feb 08 | **Guru; Demon; Illusionist ? Is it Time for an Overhaul of Expert Qualification Procedures ?** Paper Presented jointly with Maryland Innocence Project at 60th AAFS Annual Scientific Meeting, Washington, DC. |
| Feb 08 | **Impulsive Legislation. Adverse Consequences of Excluding Appropriately Qualified Experts from the Law making Process.** Paper Presented at 60th AAFS Annual Scientific Meeting, Washington, DC. |
| Feb 08 | **Rush to Judgment! Do Some Forensic Scientists Jump to Conclusions, Thereby Facilitating Injustice ?** Paper Presented at 60th AAFS Annual Scientific Meeting, Washington, DC. |
| Jun 08 | **Training seminar on forensic firearms & ballistics**. Washington DC Public Defenders 6th Annual Forensic Science Conference, Gallaudet University, June 12-13 2008. |
| Jul 08 | **Forensic Engineering Analysis of Firearm Trigger Incidents.** Paper presented at NSPE / NAFE Annual Convention, Portland, Oregon. |
| Jul 08 | **Training seminar on forensic firearms, ballistics & wound ballistics.** Indiana Public Defender Counsel, Indianapolis, Indiana. |
| Feb 09 | **Time for Change? The Science & Technology Behind Firearm Trigger Mechanism Evaluation.** Paper presented at 61st AAFS Annual Scientific Meeting, Denver, Colorado. |
| Jan 10 | **Forensic Engineering Analysis of Firearm Silencers.** Paper presented at NAFE Training Seminar, New Orleans, Louisiana. |
| Feb 10 | **Tool Mark Creation and Transfer Issues in Firearms.** Paper presented at 62nd AAFS Annual Scientific Meeting, Seattle, Washington. |
| Feb 10 | **Use of Supplementary Analytical Techniques in Firearm Tool Mark Analyses.** Paper presented at 62nd AAFS Annual Scientific Meeting, Seattle, Washington. |
| Jun 10 | **Forensic Firearms & Ballistics for the legal Profession; a Continuing Education Course for Attorneys, Judges, and Professional Engineers.** Accredited by the Indiana Supreme Court Commission for Continuing Legal Education, and the Indiana Society of Professional Engineers. |
| Jan 11 | **Forensic Firearms & Ballistics for the legal Profession; a Continuing Education Course for Attorneys, Judges, and Professional Engineers.** Accredited by the Indiana Supreme Court Commission for Continuing Legal Education, and the Indiana Society of Professional Engineers. |
| Feb 11 | **Differing Perspectives on the Use of Experts in an Adversarial Litigation System**, Are Experts Misunderstood & Misused ? Are Court Appointed Experts the Ultimate Answer ? Paper Presented jointly with State of Minnesota PD at AAFS 63rd Annual Scientific Meeting, Chicago, IL. |

Copyright ARC 2019

| | |
|---|---|
| May 12 | **Training seminar on forensic firearms, ballistics, and wound ballistics.** Missouri Public Defender Annual Training Conference, Branson, MO. |
| Aug 12 | **Forensic Firearms & Ballistics for the legal Profession; a Continuing Education Course for Attorneys & Judges.** Cincinnati, OH. Accredited for Continuing Legal Education in the State of Ohio. |
| Oct 12 | **Training seminar on firearms and ammunition technology,** NLADA Life in the Balance conference, St Louis, MO. Accredited for CLE in most States. |
| Oct 12 | **Training seminar on firearm & ammunition toolmark analysis,** NLADA Life in the Balance conference, St Louis, MO. Accredited for CLE in most States. |
| Oct 12 | **Training seminar on improvised explosive devices & destructive devices,** NLADA Life in the Balance conference, St Louis, MO. Accredited for CLE in most States. |
| Feb 13 | **Performance Evaluation of Firearm Silencers.** Paper presented at 65th AAFS Annual Scientific Meeting, Washington DC. |
| Feb 13 | **Safety Evaluation of Post Manufacture Firearm Modifications.** Paper presented at 65th AAFS Annual Scientific Meeting, Washington DC. |
| Nov 13 | **You Don't Have to Accept It in Silence: Challenging Firearms Identification Evidence, and Those Who Deliver It.** Wisconsin Public Defender Annual Training Seminar, Milwaukie WI. |
| Feb 14 | **Was That Car Used as a Weapon ? Combining Reconstruction Skills to Answer a Critical Question.** Paper presented jointly at 66th AAFS Annual Scientific Meeting, Seattle WA. |
| Feb 14 | **Investigation of Ear Witness Testimony with Regard to Sounds Heard During a Shooting Incident.** Paper presented at 66th AAFS Annual Scientific Meeting, Seattle WA. |
| Jun 14 | **Forensic Firearms, Ammunition, & Ballistics.** Washington DC Public Defender Service 11th Annual Forensic Science Conference, Washington DC. |
| Feb 15 | **A Study of Lot-to-Lot Handgun Ammunition Propellant Variables and Their Influence upon Muzzle to Target Distance Determinations.** Paper presented at 67th AAFS Annual Scientific Meeting, Orlando, FL. |
| Feb 15 | **Investigation of 'Inert' Artillery Shell Explosion.** Paper presented at 67th AAFS Annual Scientific Meeting, Orlando, FL. |
| Feb 15 | **Forensic Investigation of a Premature Mortar Explosion that Resulted in the Death and Maiming of Several US Marines.** Paper presented at 67th AAFS Annual Scientific Meeting, Orlando, FL. |
| Feb 15 | **Implementing Change in a Multidisciplinary Forensic Science World.** Paper presented at 67th AAFS Annual Scientific Meeting, Young Forensic Scientists Forum (YFSF), Orlando, FL. |
| Sep 15 | **Is the Gatekeeper Concept Failing the Justice System ? Is There a Viable Alternative ?** Paper presented at the 2015 AAFS ESS International Scientific Meeting, Toronto, Canada. |
| Feb 16 | **Is the Gatekeeper Concept Failing the Justice System ? Is There a Viable Alternative ?** Paper presented at 68th AAFS Annual Scientific Meeting, Special Joint Session, Las Vegas, NV. |
| Feb 16 | **Accident or Lovers Quarrel ?** Paper presented at 68th AAFS Annual Scientific Meeting, Young Forensic Scientists Forum (YFSF), Las Vegas, NV. |
| Aug 17 | **Human Rights & the Enduring Negative Impact of Military Weapons,** International Association of Forensic Sciences, 21st Triennial Meeting, Toronto, Canada. |
| Feb 18 | **Does Size Really Matter — Or Is How You Manipulate It More Important? A Review of Data Analysis and Presentation Tips and Tricks.** Paper presented at 70th AAFS Annual Scientific Meeting, Seattle, WA. |

Copyright ARC 2019

| | |
|---|---|
| Feb 18 | **It's a Fair System, Isn't It? Facts, Alternative Facts, and Other Litigation Influencers.** Paper presented at 70th AAFS Annual Scientific Meeting, Seattle, WA. |
| Feb 19 | **Assessing the Construction & Performance Potential of Improvised Hand Grenades.** Paper presented at AAFS 71st Annual Scientific Meeting, Baltimore, MD. |
| Feb 19 | **Handgun & Ammunition Performance Influencers.** Paper presented at AAFS 71st Annual Scientific Meeting, Baltimore, MD. |

## Continuing Education, Training, & Development (post 2001)

| | |
|---|---|
| Nov 01 | Forensic Science conference at University of Louisville Law School. |
| Sept 03 | Death Penalty conference, Indianapolis. |
| Oct 03 | Conference; Ballistics; from the Shop Floor to the Courtroom, DePaul University, Chicago. |
| Dec 03 | Forensic Science training seminar, Indianapolis. |
| Feb 04 | Forensic Science training seminar, Indianapolis. |
| Sept 04 | Forensic Science for Investigators, Indianapolis. |
| Apr 06 | Forensic Science Symposium, Indianapolis. |
| Apr 06 | Indiana Society of Professional Engineers (ISPE) Annual Convention, Indianapolis, IN. |
| May 06 | Advanced Defensive Pistol Course. |
| Sept 06 | SIG Factory Certified Armorer Course. |
| Oct 06 | Forensic Investigation, Dr Henry C Lee, Carmel, Indiana. |
| Feb 07 | American Academy of Forensic Sciences (AAFS) 59th Annual Scientific Meeting, San Antonio, TX. |
| Apr 07 | ISPE Annual Convention, Indianapolis IN. |
| Jul 07 | National Institute of Justice Annual Conference, Arlington VA. |
| Jul 07 | National Academy of Forensic Engineers (NAFE) Annual Conference, Denver CO. |
| Feb 08 | AAFS 60th Annual Scientific Meeting, Washington, DC. |
| Apr 08 | ISPE Annual Convention, Indianapolis, IN. |
| Jul 08 | NAFE Annual Convention, Portland, OR. |
| Feb 09 | AAFS 61st Annual Scientific Meeting, Denver, CO. |
| May 09 | ISPE Annual Convention, Indianapolis, IN. |
| Jul 09 | National Society of Professional Engineers (NSPE) Annual Convention, St Louis, MO. |
| Jan 10 | NAFE Training Seminar, New Orleans, LA. |
| Feb 10 | AAFS 62nd Annual Scientific Meeting, Seattle, WA. |
| May 10 | ISPE Annual Convention, Indianapolis IN. |
| Feb 11 | AAFS 63rd Annual Scientific Meeting, Chicago, IL. |
| Jan 12 | NAFE Training Seminar, Miami Beach, FL. |
| Feb 12 | AAFS 64th Annual Scientific Meeting, Atlanta, GA. |
| Oct 12 | NLADA Life in the Balance Conference, St Louis, MO. |
| Feb 13 | AAFS 65th Annual Scientific Meeting, Washington DC. |
| Jun 13 | ISPE Annual Convention, Indianapolis, IN. |
| Feb 14 | AAFS 66th Annual Scientific Meeting, Seattle, WA. |
| Feb 15 | AAFS 67th Annual Scientific Meeting, Orlando, FL. |
| Sept 15 | AAFS ESS International Scientific Meeting, Toronto, Canada. |
| Feb 16 | AAFS 68th Annual Scientific Meeting, Las Vegas, NV. |
| Jun 17 | ISPE Annual Convention, Indianapolis, IN. |
| Feb 18 | AAFS 70th Annual Scientific Meeting, Seattle, WA. |
| Feb 19 | AAFS 71st Annual Scientific Meeting, Baltimore, MD. |

Copyright ARC 2019

## Achievements & Activities

*     One of the youngest people to be elected to Fellowship of the Institution of Mechanical Engineers.
*     My expert report format was adopted by the Academy of Experts.
*     Secretary to UK explosives safety, performance, and compatibility committees (95-98).
*     NRA Certified Range Safety Officer.
*     NRA Certified pistol and personal protection instructor.
*     SIG Sauer Factory Certified Law Enforcement Armorer (2006 to 2009)